Harold Joe LANE, Appellant,

v.

The STATE of Texas, Appellee.

No. 69254.

Court of Criminal Appeals of Texas,
En Banc.

Dec. 9, 1987.

Robert T. Baskett, John H. Hagler, Dallas, for appellant.

Henry Wade, Dist. Atty. and John D. Nation, Norman Kinne & Rider, Scott, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted in Dallas County of capital murder. See V.T.C.A., Penal Code Sec. 19.03(a)(2). After the jury made an affirmative finding of the special issues in Art. 37.071, V.A.C.C.P., the trial court imposed the penalty of death by lethal injection. This case is before us on direct appeal.

The appellant presents us with sixty points of error, of which fifty complain of alleged errors during voir dire. A review of the facts is necessary.

On November 20, 1982, Patricia Morgan worked as a full-time cashier at the Winn–Dixie store on Abrams Blvd. in Dallas County. At 7:30 in the evening of that day, she had cleared the store's cash registers and was counting the day's receipts in the cashier's office. The cashier's office was a booth with walls that were six feet high, and did not reach to the ceiling. Ms. Morgan testified that she saw the appellant

pop up over the wall with his head, shoulders and arms visible to her. The appellant pointed a .357 magnum at Ms. Morgan, threw a paper bag at her, and told her, "Put the money in the bag, bitch."

Morgan testified that she put $3,000.00 in the bag and gave it back to appellant. He hopped down from the booth. While Morgan went to the phone in her booth to call the police, she watched the appellant walk over to the entrance to the store. The electronic doors wouldn't open to allow the appellant to exit because he was attempting to go out the "entrance" door. Morgan watched the appellant start to kick the doors. She then saw the deceased, Tammy Davis, approach the appellant. On the stand, Morgan testified there was a white button next to the door that would open it.

Tammy Davis was a high school senior who worked part-time at the Winn–Dixie as a cashier. On the evening of November 20, 1982, she was working her usual shift. Three witnesses at the scene testified to what happened after the appellant began to kick the entrance doors.

Tammy Davis approached the appellant from the rear. She told the appellant, "No, sir, you need to push the white ..." The witnesses disagreed as to whether she finished the sentence.

They agreed that when Tammy Davis began to speak to the appellant, apparently unaware that he had robbed Ms. Morgan, the appellant quickly turned around. Without hesitation, he raised his gun, held it straight out, and shot Tammy Davis once in the head from very close range. She died from this gunshot wound.

After shooting Tammy Davis, appellant fled from the store. A witness saw him get into an automobile driven by a second person. This witness gave the description of the automobile to the police.

Dallas police officer Tommy Joe Ames was on patrol that evening in the vicinity of the Winn–Dixie store. He was training a rookie police officer who was riding with him. Ames spotted the appellant's escape vehicle and began to pursue him. At one point during the chase, the passenger in

the escape vehicle came out of his window and leaned over the top of the car. He then shot at Ames and the rookie officer five times.

The police chased the vehicle through a residential area until it stopped and both men inside it attempted to escape on foot. Ames chased the passenger on foot and caught him. He identified the passenger as the appellant. Ames recovered a Colt Python .357 Magnum and a paper bag containing approximately $3,333.00.

The appellant took the stand and testified in his own defense. Appellant stated that he did not intend to shoot Tammy Davis. According to him, when he turned around, he only shook the gun in her face. He stated that his .357 had a hair trigger and must have discharged accidentally.

The State disputed this testimony. Their eye-witnesses did not see any shaking of the gun. A firearms examiner testified that the .357 did not have a hair trigger, but that it was stable within its normal operating range. A Dallas County jail inmate, Bruce Waggoner, testified that appellant told him that he "shot the bitch because I thought she was going to try to stop me or something." Appellant also allegedly told Waggoner, "That's what the bitch gets for being there."

The jury disbelieved the appellant and decided he was guilty of the capital murder of Tammy Davis.

At the punishment hearing, the State introduced appellant's criminal history into evidence. Appellant had prior convictions for robbery and assault with a deadly weapon in Colorado in 1970 and for murder in Louisiana in 1973. Appellant received a fifteen year prison sentence in the latter, and was released in June of 1981.

During the punishment hearing, inmate Bruce Waggoner testified for the State. According to Waggoner, appellant found out that a member of the District Attorney's office called his mother to ask her some questions. Appellant told Waggoner he would kill the person who called his mother. Waggoner also testified that appellant told him that Tammy Davis' father

called his girlfriend and upset her. Appellant stated he would kill Davis' father for this. The defense rested without putting on evidence. The jury found the evidence sufficient to support affirmative answers to Special Issues Numbers One and Two.

We reverse the judgment of the trial court for error committed during the selection of the jury.

 In point of error eighteen, the appellant complained that the trial court erred when it allowed the State to tell prospective juror Leathers that a capital murder has been committed when an accused violates the provisions of V.T.C.A., Penal Code Sec. 19.02(a)(2) or (3). The appellant alleged this misstatement of the law occurred when the State attempted to create a distinction in the mind of the juror between a finding of intentional conduct at the guilt stage of the trial, and a finding of deliberate conduct at the punishment stage of the trial. The appellant made the same argument concerning the voir dire of seven other jurors, in points of error nineteen through twenty-five.

We will review the voir dire of prospective juror Leathers:

"Q. (State's Counsel) Okay. Let's talk about Issue Number 1 and this says, Was the conduct that caused the death deliberate and with a reasonable expectation that death would result? Let's stop just a moment here and kind of break this one down. You found the person guilty of capital murder and you agreed with me they are asking something different here in this first issue as well as the other ones. If they wanted to ask you if the defendant was guilty again, they could have done that, so they are asking you something different than is he guilty, and Judge Meier told you that the words intentional and deliberate mean different things. Are you with me there?

"A. Yeah, I think so.

"Q. Okay. Now, so they are asking you to find a different set of facts because when you found the fellow guilty,

you found him guilty of intentionally causing someone's death by shooting them with a gun in a robbery. You found he did that. Now they are asking you a little bit different shade of question in that they're saying was the conduct of the defendant deliberate and with a reasonable expectation that death would result.

Let me give you a fact example here that might help. Let's say I go into a convenience store to rob Mr. Lewis here, David, and I tell him to hurry up, give me his money, and I've got a gun and he is not acting quite fast enough, so I take the gun and I fire a shot into the ceiling.

Now, intentional will be defined for you in that first trial; intentional is defined as it is your conscious objective or desire to engage in the conduct or cause the result, so I intentionally fire the gun. It's my conscious objective or desire to pull that trigger. I intentionally fire it. Bullet shoots up into the ceiling, hits something, ricochets and strikes Mr. Lewis in the head, kills him. I could be guilty of capital murder.

"(Defense Counsel): Objection to that. It's a misstatement of the law. *That could not be capital murder under that set of facts and circumstances under 19.02.*[1]

"THE COURT: Overruled.

"Q. (State's Counsel) I could be guilty of capital murder because my—I intentionally engaged in conduct that caused his death. Are you with me there? In the course of a robbery.

"A. Yes.

"Q. So you have gone back, Terry, and you have found me guilty. Now you come back into the courtroom and you're asked Sentencing Issue Number 1. You see how it's asking you something a little bit different than did I intentionally cause his death? Now it's saying, was the conduct that caused his death deliberate and did I reasonably expect that death would result from my conduct? Was there a reasonable expectation that death would result? Can you see how

---

1. Emphasis added, unless otherwise indicated.

that question could be answered no there?

"A. Yes, sir.

"Q. Okay. Contrast that with another situation. Let's say I'm again robbing David here, and I go in and I say, 'Give me your money,' and while he is doing it, I decide I'm going to blow his brains out, put the gun to his head and pull the trigger. There, I think, not only am I guilty of capital murder, but you might see where there is deliberate conduct with a reasonable expectation that he die. You see how it could be answered yes or no depending on the facts?

"A. Yes.

"Q. The trick here is that because you found someone guilty, that doesn't automatically answer any one of these three questions. It would be unfair to automatically answer one, two or three yes merely because you found somebody guilty because they are asking you, as you see, something different. You can't let the fact that you found somebody guilty pour over and answer these questions for you automatically because it's looking for different things. Are you with me there?

"A. Yes, sir."

The State's counsel later referred to this example when questioning Leathers:

"Q. The Question Number 1, Sentencing Issue Number 1 there deals with when we are talking about that deliberate conduct that caused the death, and a robbery-murder situation, it doesn't go to did he deliberately rob the store, you see; that's a different question. They're saying, you know, he may have gone in the store with a handgun, but they are asking you was the conduct that caused the death, was it deliberate with a reasonable expectation that death result. In other words, you know, in my first example, I may have deliberately gone in a store to rob Mr. Lewis, and I intentionally fired in the ceiling, but we saw where that might not be a deliberate act with a reasonable expectation that he die because we are looking to my conduct that

caused his death, and that's what this question relates to. Any problem there?

"A. No, sir."

When the counsel for appellant began to question Leathers, he attempted to determine if Leathers was able to distinguish between the separate findings without assuming that intentional and deliberate conduct meant the same thing. The trial court prevented appellant's counsel from doing so:

"Q. So, the question is, and I think you brought this up, that if you found the act was intentional—in other words, you have already found him guilty because he. acted intentionally.

"A. Right.

"Q. Would then—is that the same as deliberately?

"(State's Counsel): I object to that. Calls for a definition.

"THE COURT: Sustained.

"Q. (Defense Counsel): Would that influence you or affect you in finding he acted deliberately?

"(State's Counsel): I'll object to that as being speculative.

"THE COURT: Sustained.

"Q. (Defense Counsel) Do you understand that there is a difference there?

"A. Yes, sir."

When the voir dire of prospective juror Leathers was concluded, the appellant made the following argument in support of his request for a challenge for cause of Leathers:

"Secondly, we would state to the court that if allowed to do so, we would inquire of this juror whether or not in his mind the first sentencing issue is asking him to make a finding both of deliberate conduct and with a reasonable expectation of death, that death would result, or whether or not because he thinks deliberately and intentionally are the same thing that the question only asks him to decide whether there was a reasonable expectation of death or not.

"THE COURT: Mr. Baskett, the venireman has not said that intentionally and deliberately are the same thing.

"(Defense Counsel): He said it means on purpose, and on purpose and intentionally mean the same thing to him. We are not allowed to ask him whether—

"THE COURT: Have you finished your objection?

. . . . .

"(Defense Counsel): I'd like to at least finish making the objection then.

"THE COURT: You may state your objection, but I will not hear argument.

. . . . .

We suggest to the Court that we would be able to develop from this prospective juror that Special Issue Number 1 in his mind asks him only to determine whether there was a reasonable expectation of death from his answers and the tenor of it. We believe he has decided in his own mind, reinforced by the example given by Mr. Scott, that intentionally—if he finds an intentional killing, he has found in his own mind at that time the deliberately part and all left for him to do in the punishment phase of the trial is decide whether or not there was a reasonable expectation of death concurrent with the conduct.

We are not able to do that. We cannot possibly make a determination as to whether this juror is qualified. We are not therefore being allowed to inquire as to whether he has a bias or prejudice against some phase of the law on which we are entitled to rely, and it would be unfair to require us to exercise a peremptory challenge when we haven't been given a full, adequate opportunity to inquire about the juror's views and ability to apply the law as it is written and should be logically interpreted.

. . . . .

"THE COURT: What says the State?

"(State's Counsel): Your Honor, the State would accept Mr. Leathers as a juror in this case.

"THE COURT: What says the defense?

"(Defense Counsel): Use a peremptory challenge in regard to Mr. Leathers."

The above quoted voir dire of juror Leathers is representative of the voir dire of jurors Gunn, Lee, Niermann, Ford, Austin and Santana. As such, we will not quote from the voir dire of these six prospective jurors, and rely on the voir dire of Leathers as the most representative. *Cuevas v. State,* 742 S.W.2d 331 (Tex.Cr.App. 1987).

In point of error nineteen, the appellant complained of the State's use of the same hypothetical distinction with prospective juror Gunn. He objected to the hypothetical when the State used it. He later submitted Gunn be struck through the use of a challenge for cause. When this was denied by the trial court, the appellant used one of his peremptory challenges to strike Gunn.

In point of error twenty, the appellant made the same complaint involving prospective juror Lee. In point of error twenty-one, the appellant made the same complaint involving prospective juror Niermann. In point of error twenty-two, the appellant made the same complaint involving prospective juror Ford. In point of error twenty-three, the appellant made the same complaint involving prospective juror Austin. In each of these, the appellant's challenge for cause was denied and he had to use a peremptory challenge to strike the juror.

In point of error twenty-four, the appellant made the same complaint in regard to prospective juror Jose Santana. Appellant's challenge for cause was denied by the trial court. Appellant had exhausted his peremptory challenges prior to the voir dire of Santana. The trial court granted the appellant's request for an additional peremptory challenge, and the appellant used it to challenge prospective juror Santana. The trial court denied the appellant's request for more than one additional peremptory challenge.

In point of error twenty-five, the appellant argued that it was error to permit the State to utilize the "shooting in the ceiling" hypothetical during its voir dire of prospective juror Sutton. The State's counsel began by questioning Sutton on his percep-

tion of the difference between intentional and deliberate conduct:

"Q. (State's Counsel) She told you she couldn't tell you what deliberately meant, but the Judge told you it meant something different than intentional. Do you recall that?

"A. Yes.

"Q. Okay. You agree with that?

"A. Yes.

"Q. Obviously if they are different words they mean something a little bit different.

"(Defense Counsel): Objection to the qualification 'a little bit.'

"THE COURT: Sustained.

"(Defense Counsel): Ask the prospective juror be instructed to disregard.

"THE COURT: Disregard the words 'little bit.'

"Q. (State's Counsel) Well, whether it's a little bit or a big bit, it means something different, regardless of what term you use. If they meant the very same thing they would be the very same word, right?

"A. Yes.

"Q. You agree they mean different things?

"A. Yes.

Q. Okay. Now, the Judge is going to tell you what intentional means. She is going to give you the definition of that word. It's your conscious objective or desire to engage in the conduct or cause the result. That's what you intend. That's the definition. Now, follow with me here and let me show you how this question asks you something different than, Is the defendant guilty.

Let's say I go in to rob Mr. Lewis in a store and while I'm in there I pull a gun and tell him to give me the money, and he is not moving fast enough for me, so I take the gun and fire a shot into the ceiling. I intentionally fire a shot into the ceiling. It is my conscious objective or desire to engage in the conduct of pulling the trigger and firing that gun. I intentionally fire a shot. It strikes something in the ceiling, richochets and hits him in the head and kills him. Do you see how my intention, firing that gun, led to his death? If I hadn't pulled the trigger, obviously he wouldn't have died. With me so far?

"A. Yes.

"Q. Now, that may be capital murder under our law.

"(Defense Counsel): Your Honor, that's a misstatement of the law. We make the objections we have previously stated if the Court recalls the grounds.

"THE COURT: I recall your grounds previously stated. Your objections are overruled.

"Q. (State's Counsel) That may be capital murder under our law—

"(Defense Counsel): Same objection.

"THE COURT: Overruled.

"Q. (State's Counsel)—because my intentional act caused his death during a robbery. Are you with me? Okay. So you, Chance, and the other 11 go back there and deliberate your verdict and come back in the courtroom and say, 'Mr. Scott is guilty of capital murder; Rider is guilty of capital murder.'

Now, you get Sentencing Issue No. 1 after you found me guilty. It says, Was the conduct of the defendant, me, was my conduct that caused his death done deliberately and with a reasonable expectation that he die? In other words, did I deliberately cause his death and did I do that act with a reasonable expectation that he die? I think you can see there the answer would be no. You see how that is asking you different things?

"A. Yes.

Later, when the appellant's counsel began questioning Sutton, counsel attempted to determine if the juror had a clear understanding of the nature of the term "deliberately":

"Q. You agreed with Mr. Scott earlier that the words deliberately and intentionally mean different things. Do you recall that?

"A. Yes, sir.

"Q. You agree, or you said you had no quarrel, to use your words, had no quarrel with Mr. Scott's statement that

deliberately meant on purpose. Do you remember saying that?

"A. Yes, sir.

"Q. Okay. You understand that—well, does that mean that you think that deliberately and on purpose are the same?

"(State's Counsel): Objection, your Honor.

"THE COURT: Sustained.

"MR. SUTTON: Not necessarily.

"Q. (Defense Counsel) You understand, I think, from the way this has gone so far that when Mr. Scott talks to you about certain concepts and ideas and opinions, they are his, and when I talk to you about certain things, they are my opinions and viewpoints.

"A. Yes, sir.

"Q. And I don't think in cases like the word deliberately and what it means, neither side of us can tell you very much about what the law says regarding that word. I think Mr. Scott said that he could tell you that deliberately does not mean that it must be premeditated. Do you remember him saying that?

"A. Yes, sir.

"Q. Well, if a juror—you know, that is a version of Mr. Scott's view about the word deliberately. If a juror in looking at the question in the context of the way it is drafted, the entire question, if a juror thought that deliberately meant with forethought or with premeditation, the law would allow that juror to give it that interpretation.

"(State's Counsel): I'd object to the preface that that is a version of my view and that my definition was couched in terms of decisions by the Court of Criminal Appeals.

"THE COURT: Well, your objection is overruled to the last question.

"(State's Counsel): I object to the statement that it was a version of my view implying—

"THE COURT: Mr. Scott, I said your objection is overruled to the last question. There is no discussion about it. Go ahead, Mr. Baskett.

"Q. (By Defense Counsel) In other words, when Mr. Scott says to you it does not mean it must be premeditated, that doesn't mean that it cannot mean premeditated if that's what you think it means. Do you follow me?

"A. No, you lost me.

"Q. Okay. The statement was made that deliberately does not mean that it must be premeditated; that's what Mr. Scott said.

"A. Yes.

"Q. But the rest of the story is that if you think that deliberately in the question, the context of Question Number 1 has that element, that is, some element of deliberation or forethought or preplanning—

"(State's Counsel): I'll object to the comment 'the rest of the story is.'

"THE COURT: Sustained.

"(State's Counsel): Personal opinion by counsel and ask for an instruction to disregard.

"THE COURT: You will disregard that part of Mr. Baskett's question.

"Q. (By Defense Counsel) Well, forgetting about that particular part of it because I didn't want to mean to imply that, if you, in viewing the word deliberately in the context of that question, felt like it had some element of deliberation, meant deliberation, forethought, preplanning, whatever, that is a perfectly legitimate interpretation for you to place on it.

"A. Uh-huh.

"Q. Now, do you follow me?

"A. I understand.

"Q. In other words, the statement 'it does not mean it must be premeditated' does not mean that it could never be premeditated.

"A. Yes."

Then, appellant's counsel attempted to determine, in his questioning of Sutton, if the prospective juror could apply this personal interpretation of "deliberately" at the punishment stage, without confusing it with the statutory definition of "intentionally":

"Q. Do you really see that there is a difference, that it's calling for you to make a different factual determination?

"A. Yes, sir.

"Q. Okay. Now, given that you see that there is a difference and given that you know that a yes answer will result in a more serious punishment, when we say is it asking you to find something more, isn't it asking you to find something more severe than just the facts that allow you to find someone guilty?

"(State's Counsel): I'll object to that because the qualification of asking for a finding of a different fact circumstance.

"THE COURT: I'll overrule your objection and allow the question.

"Q. (By Defense Counsel) Do you understand my question?

"A. No, I don't.

"Q. If you find it yes, a more severe punishment can be imposed.

"A. Correct.

"Q. Therefore, doesn't it make sense that the question is asking you to find more severe facts?

"A. *No.*

"Q. Does not? Then sometimes it may be put this way: an intentional murder during a robbery is a life case and an intentional and deliberate murder during a robbery could be a death case. Now, there are two mental states involved, if you will. One is the intentional mental state—

"(State's Counsel): No, I object to that absolutely.

"THE COURT: I have got to hear the question, Mr. Scott.

"(State's Counsel): It involves a question of mental states and that is not contained within Special Issue Number 1.

"THE COURT: Your objection at this point is overruled.

"Q. (By Defense Counsel) You have two mental states involved. One is intentionally; you have to find that in order to find someone guilty of capital murder. Are you with me?

"A. Yes.

"Q. Now, the word deliberately, whatever it may mean to you, also connotes a mental state.

"(State's Counsel): I object to that. The question specifically relates—

"THE COURT: Sustained.

"(State's Counsel): Ask for an instruction to disregard.

"THE COURT: You will disregard the last part of Mr. Baskett's question.

"(Defense Counsel): Your Honor, please note our exception to being so limited. That's exactly what we think the question does ask.

"Q. (By Defense Counsel) Do you think that, Mr. Sutton, do you think that when it asks you to find whether something was committed deliberately that it's asking you to find a mental status that accompanies the conduct that causes the death of a person?

"(State's Counsel): I'll object to that as going into the definition.

"THE COURT: Sustained. Don't answer the question.

"Q. (By Defense Counsel) I'm not asking for your definition of deliberately; I just want to know if you think that it is designed to require the jury to find some kind of mental status on the part of an accused person?

"(State's Counsel): Object to going behind the question.

"THE COURT: Sustained.

"Q. (By Defense Counsel) Do you think that there is any difference in finding an intentional—you remember the definition of intentional?

"A. Yes.

"Q. Conscious objective or desire; do you think that—and you know that's a mental state. I mean, that's what the law calls it, a culpable mental state.

"A. Yes, sir.

"Q. Now, do you think that Question Number 1 is asking you to find any sort of a different mental state than what you're required to find when you find intentional conduct?

"(State's Counsel): I'll object to that as an indirect calling for a definition.

"THE COURT: Sustained.

"(Defense Counsel): Again, your Honor, please note our exception.

"THE COURT: The objection is sustained.

"Q. (By Defense Counsel) Do you really think Special Issue Number 1 asks you to find anything different than you would be required to find to find someone guilty?

"A. Yes.

"Q. In what respect?

"(State's Counsel): Object to that.

"THE COURT: Sustained.

"Q. (By Defense Counsel) You told me you did not see it was asking you to find, in your opinion it was not asking you to find any more severe a set of facts or circumstances. You said that awhile ago. Do you remember that?

"A. Yes, sir.

"Q. Do you think, therefore, that it's calling you to find some less severe set of facts in order to impose the death sentence?

"(State's Counsel): Judge, I object to the less.

"THE COURT: Sustained.

"(Defense Counsel): Again note our exception to being so limited, your Honor. Can I approach the bench? [2]

A few minutes later, the trial court terminated the appellant's questioning of Sutton. Counsel for appellant attempted to obtain more time to resume his inquiry into Sutton's ability to distinguish between intentional and deliberate conduct, especially in light of the State's use of the hypothetical:

"THE COURT: Your time has expired Mr. Baskett.

"(Defense Counsel): I would ask for additional time, your Honor, and I would also at this point submit to the Court that if allowed to do so, we would question Mr. Sutton and ask all those questions, if the Court recalls them and the context of our request that we have asked, or attempted to ask the Court and

the Court has denied us the opportunity to do so.

"THE COURT: The Court recalls your questions previously propounded, those which were propounded and ruled upon; the rulings remain the same. I will not allow you to propound the questions. Your time has expired.

"(Defense Counsel): The Court will not grant us additional time?

"THE COURT: The Court will not grant you another extension of time, no, sir.

"(Defense Counsel): Please note our exception to that ruling, unduly limiting us."

The State's counsel informed the court that Sutton was acceptable to them. The trial court excused Sutton from the courtroom while appellant's counsel made his requests and objections.

"(Defense Counsel): Your Honor, because of the limitation placed on us in the voir dire examination of Mr. Sutton, we really are unable to determine whether or not he would be an acceptable juror. We, as the Court knows, do not have any more peremptory challenges. We would ask the Court excuse Mr. Sutton because we have not had an opportunity to fairly examine him as to his opinions and feelings and cannot therefore make an intelligent choice, so we would first ask that.

"THE COURT: The Court will not excuse Mr. Sutton at this point.

"(Defense Counsel): *Well, he would not be acceptable to us on this jury, your Honor, for the reason we have previously stated* [3] and we would ask for an additional peremptory challenge.

"THE COURT: Your request is denied.

"(Defense Counsel): May I make a brief statement for the record?

"THE COURT: You may.

"(Defense Counsel): We believe we are entitled to additional peremptory chal-

---

2. This conference at the bench was not recorded, or otherwise made a part of this record. After the conference, appellant's counsel did not resume the line of questioning.

3. Emphasis added.

lenges because of the number of occasions during the course of this voir dire during which the Court has either excused someone on challenge of the State, therefore giving them an additional peremptory challenge, or failed to excuse someone on challenge of the defense and required us, improperly we feel, to exercise a peremptory challenge, and if I may, without unduly lengthening the record and without intending it to be an all-inclusive list, state the names of those prospective jurors which we feel fall into one of the other of those two categories.

"THE COURT: Go ahead.

"(Defense Counsel): Eugene Cooper, which was March 21st, the Court did not excuse him when we felt he was disqualified due to—

"THE COURT: Excuse me, Mr. Baskett, are you going to state the names and only the names into the record or are we going to go over all of the objections that have been made in the last six and a half weeks?

"(Defense Counsel): I was going to briefly summarize why we thought the juror was either improperly excused by the Court or not excused and therefore requiring the defendant to exercise a strike.

"THE COURT: Are these objections not in the record already?

"(Defense Counsel): Well, they may very well be. If that's the case, if I could just state the name of the prospective juror and the date.

"THE COURT: Go ahead.

"(Defense Counsel): Eugene Cooper, March 21, 1983; Watson Durden, March 22, 1983; Shirley Campbell, March 22, 1983; Bobby Nunn, March 23, 1983; Jo Ann Leer, March 24, 1983; K.C. Cooper, March 24, 1983; Rosemary Katzen, March 29, 1983; Maribell Hamilton, April 5; David Baker, April 5; Ted Howard, April 6; Bobby Stegall, April 25; Robert Edwards, April 25; Tyrone Martin, April 26; Bill Gunn, April 27; Ruth Ellen Lee, April 28; Sandra Niermann, April 29; Vickie Kazee, April 29; and Dellie Al Ford, April 29. Also today, Melody Mallicote and Leo Pace. Had the Court excused those persons or not excused those who were not absolutely disqualified, we would not be out of peremptory challenges.

"THE COURT: Your objections are overruled; your exception is noted.

"(Defense Counsel): Your Honor, we would once again, after having made this known to the Court, ask the Court once again for another peremptory challenge.

"THE COURT: Your request is denied.

"(Defense Counsel): We would also ask the Court not say 'What says the defendant?' in the presence of the prospective juror, then, since we cannot say we accept him and we have no way to excuse him.

"THE COURT: Your request is granted. Bring Mr. Sutton in, please."

Sutton became the twelfth member of the jury. There is no question that appellant objected to the use of the "shooting in the ceiling" hypothetical with a prospective juror who became a member of the jury. We must determine if the hypothetical was a misstatement of the law, and whether it was error for the trial court to permit the State to use the hypothetical in the voir dire of a member of the jury.

The recent decision of *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987), is controlling in the instant case. During voir dire in *Gardner*, the State's attorney attempted to rehabilitate a prospective juror. In this attempt, the State used a hypothetical which closely resembles the hypothetical which is the basis for appellant's point of error. In *Gardner*, the following occurred:

"Q. ... Let me go back to my example we used. I go and rob (prosecutor's co-counsel). He doesn't get the money for me fast enough. I intentionally shoot him in the leg. His injury to his leg causes his death. I am guilty of capital murder. I intentionally caused his death by shooting him with a handgun while in the course of committing robbery. You have answered that question. You found me guilty.

Now, merely because you have done that, are you automatically going to say I acted deliberately and with a reasonable expectation that he died? Or will you wait and hear the evidence and see if the proof can come from the State to show you that I acted with a reasonable expectation that he die when I shot him deliberately.

Do you see what I am saying?

"A. Yes, Sir.

"Q. Do you see the difference there?

"A. Yes, sir.

. . . . .

"Q. Can you see how that question could be answered no even if the state didn't bring you any further evidence? For instance, where I go in and rob (as co-counsel), and I shoot him in the leg. Do you see how you can find that although I may have deliberately shot him in the leg, I didn't have a reasonable expectation that he die when I shot him? Do you see how that question can be answered no?

"A. Yes, I do now, yes." *Gardner*, supra, at 686.

This Court found that the prospective juror's answers were predicated on the prosecutor's inaccurate statement of the law.

"what is clear is that by his hypothetical he intended to show the venireman that finding an accused guilty of an intentional killing would not 'automatically dictate an affirmative answer to special issue one. Unfortunately the hypothetical does not embrace facts which amount to a capital murder. Thus, it utterly fails

to illustrate the intended point.'" *Gardner*, supra, at 687.

In the instant case we assume the State's attorney used his hypothetical ("shooting in the ceiling") to assist the juror Sutton in distinguishing between a finding of intentional commission of murder and a finding of a deliberate commission of murder "with the reasonable expectation" that death would result. However, due to the inaccuracy of the hypothetical, it could only have confused juror Sutton's and other jurors' common sense impression of intentional and deliberate conduct.

In this cause, the applicable theory of capital murder is set out in V.T.C.A., Penal Code Sec. 19.03(a)(2).[4] The "shooting in the ceiling" hypothetical presented facts which do not constitute the offense of capital murder. Even if the State's hypothetical robber intentionally shot into the ceiling to warn the victim, e.g., to further his scheme to take the victim's money, this would not "render the actor susceptible to a conviction for capital murder, because on its face it does not show that the actor intentionally caused the death of the deceased." *Gardner*, supra. At the most, the facts of the State's hypothetical constitute only murder, as it is defined in V.T. C.A., Penal Code Sec. 19.02(a)(3).[5] This hypothetical was a blatant misstatement of the law of capital murder.[6]

As a result, the State's hypothetical created a false distinction between the two terms. The State used this hypothetical on direct voir dire with each juror who admitted they had difficulty seeing the difference between intentional and deliberate conduct. Appellant used six of his statu-

---

4. Sec. 19.03(a)(2) reads:

"(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

. . . . .

(2) the person intentionally commits the murder in the course of committing or attempting to commit ... robbery ...;
Sec. 19.02(a)(1) reads:

"(a) A person commits an offense if he:
(1) intentionally or knowingly causes the death of an individual."

5. "(3) commits or attempts to commit a felony other than voluntary or involuntary man-

slaughter, and in the course of and in furtherance of the commission or attempt, ... he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

6. *Burke v. State*, 652 S.W.2d 788 (Tex.Cr.App. 1983). In *Burke*, Presiding Judge Onion discussed the effect of a prosecutor's misstatement of the law during final argument. "The prosecutor's remark was not only erroneous but was so manifestly improper, under the circumstances, to require the reversal of the judgment. *Burke*, at 791.

tory peremptory challenges, and his only additional peremptory challenge to strike the first seven jurors who were subjected to the misleading voir dire. The trial court did not permit appellant to challenge Sutton on these grounds, and Sutton became the twelfth juror.

When Sutton took the stand on voir dire, he conceded that a finding of deliberate conduct required more proof than a finding of intentional conduct. The State's attorney then presented the hypothetical to Sutton, which could only give Sutton the impression that any intentional act indirectly causing the death of a victim during a robbery will raise the crime to an intentional capital murder. This is clearly less than the statutory requirement (see footnote 4) for proving the intentional commission of a capital murder. The second part of the hypothetical created a definition of deliberate conduct which was actually a working definition of the term "intentional."[7] In this manner, juror Sutton was indelibly impressed with a false dichotomy between the two terms. He went into the jury box believing that a less rigid standard of proof was required to affirmatively answer Special Issue Number One at punishment. After listening to the State's hypothetical, Sutton stated that he could clearly distinguish between the two terms.

This Court has emphasized the importance of jurors being able to accurately discern the separate meanings of intentional and deliberate conduct. In his dissenting opinion in *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983), Judge Clinton wrote:

"I believe that the first premise underlying the conclusion in *King*,[8] is still viable today: 'deliberately' is a word simple in itself and is used in Article 37.-071(b)(1), is to be understood in its ordinary meaning. It has taken on a techni-

cal or special definition only in the sense enunciated in *Heckert*, supra:[9] 'deliberately' is neither the linguistic nor connotative equivalent of 'intentionally.' And as *Heckert* acknowledges, this distinction is crucial, for a failure to regard it would render the first special issue a nullity." *Russell*, supra, at 784.

Even though this Court has properly declined to assume a legislative function and define "deliberate", and instead relied on the "ordinary meaning" of the term as a juror individually knows it, this Court cannot condone an attempt by a State's attorney to mislead a juror into believing the definition of deliberate conduct is nothing more than a second finding of intentional conduct.

When the appellant's counsel began its voir dire of juror Sutton, he attempted to determine the extent of the juror's misinterpretation of the two terms. The few answers, which juror Sutton was able to give, indicated that he was now relying on a false distinction. The trial court's actions only served to protect this mistaken impression. As this Court held in *Gardner*, the misleading hypothetical of state's counsel justified the appellant's effort to see if juror Sutton understood the two terms:

"Appellant's attempt to ascertain if 'deliberate and with a reasonable expectation of a certain result', meant 'the same thing' to (the prospective juror) as the definition he gave her of 'intentional" was a proper inquiry....

The only reasonable thing for appellant to do ... was to go straight to the heart of the matters. A venireman who fails to perceive a difference between 'intentional' and 'deliberate' ... will certainly have problems reconsidering guilt stage evidence for its probativeness toward special issues, or for that matter,

7. V.T.C.A., Penal Code Sec. 6.03(a) sets out:
 "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or *cause the result.*" (emphasis added) It seems appropriate to comment here on how beneficial it would be to this Court in resolving voir dire points of error for the Legislature to accept its responsibility, and define the term "deliberately" as it is set out in Art. 37.071(b)(1).

8. *King v. State*, 553 S.W.2d 105 (Tex.Cr.App. 1977).

9. *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App. 1981).

considering any new evidence presented at the punishment phase with the requisite degree of impartiality." *Gardner,* supra, at 689.

The instant case is unlike *Gardner* in a crucial way. In the instant case, the juror Sutton was placed on the jury over the appellant's objection, and his request for an additional peremptory challenge. This adversely affected the most important duty of the jury in a capital murder trial. As Judge Clinton noted in *Russell:*

> "Apparent, then, is the crucial function of the 'deliberateness question' in the Texas capital murder scheme: potentially the difference between life imprisonment and death. It follows that the jury's consideration of this question must be focused on the individual conduct of the defendant in the capital murder transaction and that the jury comprehend its meaning as distinct from other inquiries in the case." *Russell,* supra, at 786.

In the instant case, juror Sutton was incapable of carrying out this crucial function because the hypothetical deceived him in believing his impression of deliberate conduct was distinct from a legitimate inquiry into the intentional nature of the appellant's conduct. As mentioned in *Gardner,* the defense may successfully challenge for cause a "venireman who is unable to reconsider guilt evidence in the particular context of special issues." Certainly the venireman who cannot distinguish between an "intentional" and a "deliberate" killing will have substantial difficulty in this regard. *Gardner,* supra, at 689. The appellant's challenge for cause to juror Sutton was denied. His request for an additional peremptory challenge was denied. Juror Sutton was seated as the twelfth juror. The harm is evident and the error has been preserved. *Barney v. State,* 698 S.W.2d 114 (Tex.Cr.App.1985); *East v. State,* 702 S.W.2d 606 (Tex.Cr.App. 1985); and *Bell v. State,* 724 S.W.2d 780

(Tex.Cr.App.1986). Appellant's twenty-fifth point of error is sustained.

■ We also note that in point of error thirty-three, the appellant complains that the trial court erred when it restricted the appellant's questioning of juror Sutton as to his understanding of special issue number one. As we quoted from *Gardner,* this was a proper inquiry for the defense, in light of the hypothetical used by the State. This was a denial of the appellant's opportunity to intelligently exercise his voir dire of juror Sutton. The appellant also asserted that his opportunity to exercise peremptory challenges against jurors Lee, Nierman, Ford and Austin were similarly impaired. Appellant used four of his peremptory challenges against Lee, Nierman, Ford and Austin. When his peremptory challenges were exhausted, and his request for additional challenges was denied, he cited the names of jurors Lee, Nierman and Ford as being erroneous denials of his challenges for cause, and as being jurors upon whom he was forced to use peremptory challenges. The trial court denied his requests for more peremptory challenges. A juror unacceptable to appellant was seated. The error was preserved, and the harm was not cured. *Gardner,* supra, footnote 9, at 690. Appellant's thirty-third point of error is also sustained.

■ In the fifty-first point of error in the appellant's brief, he argues that the evidence is insufficient to support the jury's answer to special issue number one that the conduct was committed deliberately. We will review this point. As this Court stated in *Selman v. State,* 663 S.W.2d 838 (Tex.Cr.App.1984), "sufficiency of the evidence must be considered by this Court even if the conviction is reversed for an unrelated reason or reasons." We hold the evidence was sufficient to sustain the jury's verdict on Special issue Number One.[10]

---

**10.** This does not affect our finding that the appellant was harmed by the State's voir dire of juror Sutton. In point of error fifty-one we are reviewing the evidence in the light most favorable to the verdict, in order to determine if any rational trier of fact could find, beyond a rea-

sonable doubt, that the appellant committed the act "deliberately and with the reasonable expectation that death would result." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Sutherlin v. State,* 682 S.W.2d 546 (Tex.

We balanced the evidence on both sides of this sufficiency question, considering the evidence at both stages of the trial. *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr.App. 1986).

On the appellant's side of the issue, he testified that the shooting was accidental as a result of the "hair trigger" of his firearm. The State's eye-witnesses disputed appellant's version of his actions in shooting the victim. The State's firearms expert proved that appellant's weapon was far too stable to be considered as having a "hair trigger."

On the State's side of the case, there was the testimony of the eye-witnesses to the shooting. In addition, there was the testimony of the appellant's cellmate. The cellmate reported the statements made by the appellant in jail. Considering all of the evidence, it reached the level of sufficiency which was described in *Williams v. State,* 674 S.W.2d 315 (Tex.Cr.App.1984), and surpasses the level of sufficiency described in *Smith v. State,* 540 S.W.2d 693 (Tex.Cr. App.1976).[11] We overrule the appellant's fifty-first point of error.

Due to our disposition of points of error twenty-five and thirty-three, we reverse the judgment of the trial court and remand the case to that court.

McCORMICK, J., concurs in the result.

ONION, P.J., and W.C. DAVIS, J., dissent.

DUNCAN, Judge, concurring.

Writing for the Court, Judge White states: "the defense may successfully challenge for cause a 'venireman who is unable to reconsider guilt evidence in the particular context of special issues.' Certainly the venireman who cannot distinguish between an 'intentional' and 'deliberate' killing will have substantial difficulty in this regard." (P. 629). I agree with Judge White's observation.

Since the effective date of § 19.03, *Tex. Penal Code* (1974) and Art. 37.071, V.A.C. C.P. in 1974 this Court has been inundated with appeals in which there was obvious confusion among the judges, lawyers and jurors as to how "intentionally" could be different than "deliberately." The reason for this confusion is that there is only a vague, almost indiscernible, difference in the practical, everyday use of the words. When vagueness in an indispensable, statutory component of the criminal trial process inexorably produces such continuous confusion the entire process is verging on violating a defendant's right to due course of law under Art. I § 19 of the Texas Constitution.

Judge Clinton stated in his dissenting opinion in *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983) (Clinton, J. Dissenting) that " '[d]eliberately' is neither the linguistic nor connotative equivalent of 'intentionally.' " Id. at 784 Judge Clinton is correct. However, the words are denotatively equivalent. That is, they similarly point out or refer to essentially the same thing: the state of mind that accompanies one's conduct. This is particularly evident when one

---

Cr.App.1984); *DeGarmo v. State,* 691 S.W.2d 657 (Tex.Cr.App.1985).

This determination is distinct from our review of the selection process used to seat the jury. In our review of the sufficiency of the evidence, we focus on whether any rational trier of fact could make the same determination. This is necessary to achieve a review in the light most favorable to the verdict. This detached and objective review differs from a review of the harmful voir dire of a juror who was a member of the actual panel who rendered the verdict. There is nothing hypothetical in determining whether there was harm in seating a juror who, as a result of the State's voir dire, could not rationally distinguish between deliberate and intentional conduct. Juror Sutton

would have problems considering and applying evidence from both stages of appellant's trial on Special Issue Number One, since he believed an affirmative answer on Number One merely required a second finding of intentional conduct. Our decision, that the evidence was sufficient to support an affirmative answer to special issue number one, does not render harmless the seating of juror Sutton.

11. As we noted earlier in this opinion, a statutory definition of the phrase "deliberately, and with the reasonable expectation that death would result," would standardize and simplify our review of questions of sufficiency on Special Issue Number One.

recognizes that authoritative reference sources use deliberately as a synonym for intentionally, and vice-versa. See: A.F. Sisson, *Sisson's Synonyms* (Parker Publishing Co., Inc.: West Nyack, N.Y., 1969), p. 176 and 178; J.R. Rodale, *The Synonym Finder* (Rodale Books, Inc.: Emmaus, Pennsylvania, 1977), p. 260 and 620.

It has been observed that:

[a] word is vague if the things habitually characterized by it are not sharply distinguished from those things which are habitually denied characterization—with the consequence that for some things falling within its range of application the use of the word is indeterminate.

Ernest Nagel, "Some Reflections on the Use of Language in the Natural Sciences," in *Teleology Revisited and Other Essays in the Philosophy and History of Science* (New York: Columbia University Press, 1979), p. 51.

In the case of the words "deliberately" and "intentionally" the denotative distinction of the words is, as a practical matter, indistinguishable. The thing (state of mind) that is "habitually characterized ...," *Id.*, by the words is the same. But in the punishment phase of the capital murder trial when "deliberately" is not to be used in its normally accepted context there is no express guidance as to how it is to be "sharply distinguished ...," *Id.*, from intentional. Such vagueness in words that are part of the statutory procedural foundation of society's exercising the death penalty is unacceptable.

In *Williams v. State*, 674 S.W.2d 315 (Tex.Cr.App.1984) Judge Davis points out that "[w]hile a majority of the court does not agree, four judges, W.C. Davis, Clinton, Teague, and Miller do agree that upon timely request by a capital murder defendant or the State, that party is entitled to have the jury ...," *Id.* at 322, fn. 6, given an instructive definition of "deliberately." Judge Davis continues by quoting the definition of "deliberately" that was suggested by Judge Clinton in his dissenting opinion in *Russell v. State, supra:*

(1) as employed in the first special issue, the word "deliberately" has a meaning different and distinct from the word "intentionally," as that word was previously defined in the charge on guilt, and

(2) instead, as employed in the first special issue, the word "deliberately" means a manner of doing an act characterized by or resulting from careful and thorough consideration; characterized by awareness of the consequences; willful, slow, unhurried, and steady as though allowing time for a decision. *Id.* at 787.

Based upon the foregoing observations, it is my opinion that the absence of a definition of "deliberately" during the punishment phase of a capital murder trial does nothing to further the administration of justice in that it invariably causes confusion among the judges, lawyers and jurors. Therefore, in the future (trials that commence after the date of this opinion) I would suggest that upon request by either the State or the defendant that trial judges give the jury an appropriate definition of "deliberately" that they are to use in answering the first special issue under Art. 37.071(b)(1).

With these additional comments I join Judge White's majority opinion.

CLINTON, J., joins.