Ricky Eugene MORROW, Appellant,

v.

The STATE of Texas, Appellee.

No. 69263.

Court of Criminal Appeals of Texas, En Banc.

March 30, 1988.

William A. Bratton, III, Ronald L. Goranson, Dallas, for appellant.

Henry Wade, Dist. Atty., and Jeffrey B. Keck, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of the offense of capital murder under V.T.C.A. Penal Code, § 19.03(a)(2), and, the jury having answered special issue numbers one and two affirmatively, Article 37.071(b), V.A.C.C.P., his punishment was assessed death. Appellant does not challenge sufficiency of the evidence in any respect.

In his fifteenth point of error appellant complains of a hypothetical question posed to a number of veniremen during the early portions of the voir dire which was intended to demonstrate the difference between a murder that is committed intentionally and one that is done deliberately. For reasons developed in *Lane v. State*, 743 S.W.2d 617 (Tex.Cr.App.1987), and *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987), we find this hypothetical to have been improper. Furthermore, under the circumstances presented here, we agree with appellant that the use of the hypothetical so infected the voir dire process as to violate his guarantees of due course of law and representation of counsel under Article I, §§ 19 and 10, respectively, of the Texas Constitution.

Each of the first ten veniremen was questioned extensively on direct voir dire by the State concerning his or her ability to understand and apply the Article 37.071 special issues. During the course of this, each was informed that the law requires the factfinder to recognize a distinction between its duty to determine, at the guilt/innocence phase of trial, whether the murder was intentional, and its duty to undertake at punishment the discrete inquiry whether the killing was "committed deliberately and with the reasonable expectation that ... death ... would result." By way of explanation of the difference between an intentional and a deliberate murder the prosecutor presented substantially the same hypothetical to eight of these veniremen,[1] the gist of which was as we find in the voir dire of venireman Charles Race:

"[PROSECUTOR:] Let me give you an example of how they differ from finding a person guilty of capital murder. Let's say that I go in and rob [Co-counsel] in the 7–Eleven store. He gives me the money and, for whatever reason I have, I'm leaving and I—it is my conscious objective or desire to engage in the conduct of pulling the trigger on the gun that I have and shoot him. And I shoot him. I just so happen to shoot him in the knee and medical complications set in and he dies. That is a murder that occurred during the course of a robbery because he wouldn't have died if I hadn't shot him. You may very well go out and find me guilty of capital murder, you see? I committed the crime in Dallas County, January the 19th, had a gun, caused his death by shooting him with a gun during a robbery—

[Defense counsel]: We're going to object to that hypothetical as not being substantial and the facts that would be required to substantiate a capital murder. The fact that he leaves out that he intentionally committed the murder in the course—he said he shot him. There's no requisite intent to commit the murder as required in the Capital Murder Statute. All he's given is a hypothetical that comes under the third circumstance of the statute [V.T.C.A. Penal Code, § 19.02(a)(3)] and, therefore, is a death caused by an act committed in the course of a felony. We would object to that hypothetical as not being proper.

THE COURT: Overruled.

[Defense Counsel]: Note our exception.

[Prosecutor] You see how you can find me guilty of that offense?

Switch number one has been answered 'yes.'

McLaughlin.

---

**1.** They were veniremen Gragg, Race, Donosky, Potersnak, Toups, Kimble, Vowell and

Now you come to switch number two, that first question up there. You see that there's a different inquiry being made of you than whether I committed the crime?

A. (Nods head.)

Q. Now you're asked: Was my act deliberate and with a reasonable expectation that death would result? You might say, if he got shot in the knee, he didn't reasonably expect that he's going to die, and I'm going to answer that 'no.'

A. Right.

Q. Contrast that with the situation, Mr. Race, where I go into the 7–Eleven to rob it. I finish robbing. I intentionally fire the gun. This time I do it right at his head and pull the trigger and blow his brains out. Can you see how that is a deliberate act with a reasonable expectation that death would result?

A. Yes, I can see that."

Appellant objected unfailingly each time this hypothetical was repeated and expressly challenged each of the eight veniremen for cause on account of its use. The objections were overruled and the challenges were denied. Of those eight veniremen, two were excused by agreement of appellant and the State, one was peremptorily challenged by the State, and one, venireman Race, sat on the jury. Appellant excercised a peremptory strike on each of the remaining four.

Following voir dire of the first ten veniremen, the prosecutor invoked the faulty hypothetical during questioning of four of the remaining 46 veniremen.[2] Appellant objected each time and challenged each of the four veniremen for cause on the basis of use of the hypothetical. Two were peremptorily struck. The other two, including veniremen Gary Woods, ultimately served on the jury, though appellant had peremptory challenges remaining at those points. The voir dire of Woods proceeded as follows:

Let me try a different example. I go into a Seven-Eleven. I take the gun and I get the money from [Co-counsel]. I take the gun and I fire at [Co-counsel]

and leave. The bullet hits [Co-counsel] in the leg and as a result of that, he bleeds to death. I've intentionally caused his death because I've engaged in the conduct. Okay? Conscious objective or desire to engage in the conduct. I pulled that trigger.

[Defense Counsel]: We would object to that as not being a proper definition of 'intentional'. It's not just pulling the trigger, it's a mental state and an act together. If you're intentionally causing the death, that has to be your intentional objective or desire to engage in the conduct to cause results. If you just meant to shoot him in the leg, that's not an attempt to kill.

THE COURT: Overruled.

Q. [Prosecutor] You've got that first example. I walk in the store, get the money, take the gun—it's my conscious objective or desire to pull the trigger on the gun. The bullet hits [Co-counsel]. He bleeds to death. That's an example of when I intentionally caused the death of an individual while in the commission of a robbery.

Here's example number two. I go into the Seven–Eleven. I get the money from [Co-counsel]. I take the gun. I don't just fire at him, I take it and put it right up to his head. It's just an inch away from the side of his temple, and I pull the trigger and I blow his brains out. Under that fact scenario, the first part of intentionally engage in the conduct, conscious objective or desire to engage in the conduct, you bet. Second question: deliberately engage in the conduct with a reasonable expectation that death would occur, second example. Does that, perhaps, draw the distinction for you a little better?

A. I see the distinction that you tried to get to, yes, sir. He deliberately shot him in the head knowing he was going to die or should die.

Q. That's right. As opposed to just shooting at him and having the bullet hit him somewhere and then bleeding to death—

---

**2.** They were veniremen Fry, Woods, Bell and Hanneken.

[Defense Counsel]: If that's the example they're using of just shooting at him and him ended up bleeding to death, that's not capital murder and we would object to that example being used. He could confuse this prospective juror, and we would ask that he be instructed to disregard that as even an example.

THE COURT: Disregard the statement of the prosecutor about shooting at somebody. It is not a capital murder.

Q. [Prosecutor] I didn't mean to change my example. The first example I gave you is where I shoot the gun. It's my conscious objective or desire to engage in the conduct. I pull the gun, the gun fires and hits [Co-counsel] in the leg and then he bleeds to death. That's the example I meant for the first one.

[Defense Counsel]: Your Honor, we're going to object to that as, further, not being intentionally causing the death if all he's doing is shooting the gun and he doesn't intend to cause the death.

THE COURT: Overruled.

\* \* \* \* \* \*

Q. [Prosecutor] I've got these two examples. The first example was where I walk in and I take the gun and I fire the gun. It's my intent to fire the gun to engage in that conduct or fire the gun. The bullet hits [Co-counsel] in the leg and he bleeds to death, and I go out with the money. It answers the first question 'intentional'. It might or might not answer the second question of whether it was done deliberately with a reasonable expectation that death would occur.

The second example—

[Defense Counsel]: Your Honor, as to that first example, we would, again, that it's not an intentional act and not a proper definition. Same objection.

THE COURT: Overruled.

[Prosecutor] When the Judge says 'overruled', that means the example I used, you can use or consider it.

The second example, he walks into the Seven–Eleven. He takes the gun an inch from [Co-counsel]'s head and pulls the trigger. That's intentional and deliberately with a reasonable expectation that death would occur. Okay?"

▮▮▮ Here, as we said in *Gardner v. State*, supra at 687:

"The scenario posed by the prosecutor certainly presented facts which could constitute the offense of murder under either V.T.C.A. Penal code, § 19.02(a)(2) or (3); or even under § 19.02(a)(1), supra inasmuch as it may show a 'knowing' killing. But the shooting of a robbery victim *in the leg* in order, e.g., to prevent apprehension, even if an intentional and deliberate act, would not render the actor susceptible to a conviction for capital murder, because on its face it does not show that the actor intentionally caused the death of the deceased. In fact, the hypothetical does not show a 'capital' murder at all. Thus, it cannot possibly serve to demonstrate to the venireman an example of a 'capital' murder that might have been 'intentional' but would not have been 'committed deliberately and with the reasonable expectation that ... death ... would result.'"

When the intentional shooting of an individual in the leg does not present facts amounting to intentionally causing the death of that individual, so much less so does the mere intent to pull the trigger of a firearm. Like the hypothetical in *Lane v. State*, supra, at 628, that given here "could only give [veniremen] the impression that any intentional act indirectly causing the death of a victim during a robbery will raise the crime to an intentional capital murder. This is clearly less than the statutory requirement ... for proving the intentional commission of a capital murder."[3]

---

**3.** In order to be guilty of capital murder under § 19.03(a)(2), supra, an accused must have "intentionally commit[ed] the murder." We construe this provision to exclude all forms of murder under V.T.C.A.Penal Code, § 19.02, except that provided in subsection (a)(1)—and then the appellant must have "intentionally cause[d] the

death" of his victim. To have "knowingly" caused the death of another does not violate § 19.03(a)(2), supra. *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex.Cr.App.1986). Intentional murder under § 19.02(a)(1), supra, is a "result of conduct" offense; that is to say, not only must an accused be found to have intended to

Furthermore, as we also observed in *Lane*, in thus diluting what is required of the State to prove an "intentional" killing, the hypothetical concomitantly endorses an artificially low threshold of proof to establish the killing was "committed deliberately...." *Id.* Three veniremen ultimately sat on the jury in this cause who were exposed, with apparent approval from the trial court, to this watered down measure for determining deliberateness. Moreover, appellant was forced to expend six of his statutorily allotted fifteen peremptory challenges to prevent other veniremen similarly misled from sitting.[4]

In *Gardner v. State*, supra, we further observed that:

"only upon manifesting an inability, once the issue of guilt has been resolved against the accused, to *reconsider guilt evidence in the particular context of special issues*, has a venireman demonstrated himself unable objectively to follow the law. Such a venireman would certainly be subject to a State's challenge for cause. * * * [T]he State, and, *a fortiori*, an accused, may successfully challenge for cause the venireman who is unable to reconsider guilt evidence in the particular context of special issues. * * * A venireman who fails to perceive a difference between 'intentional' and 'deliberate ...' will certainly have problems reconsidering guilt stage evidence for its probativeness toward special issues, or for that matter, considering any

new evidence presented at the punishment phase with the requisite degree of impartiality."

*Id.*, at 680, 689.

The hypothetical in the instant cause was in every instance given to the venireman during the State's direct voir dire, before appellant could even begin to question the particular venireman's ability to comprehend any genuine distinction between "intentional" and "deliberate." Appellant was thus effectively precluded from mounting a challenge for cause in the ordinary sense against any of these veniremen on that basis. Indeed, as *Lane*, supra, establishes, the hypothetical given here actually *rendered* the veniremen challengeable for cause inasmuch as it instilled in them, under the trial court's auspices, a bias against the law. Furthermore, the hypothetical could only have corrupted the answers to the undeniably "proper" questions appellant subsequently posed to each of the veniremen relative to his ability to comprehend a distinction between the two statutory terms, thus denying appellant the intelligent use of a significant portion of his peremptory challenges. *Smith v. State*, 703 S.W.2d 641, 643 (Tex.Cr.App.1985). Under the circumstances presented here, harm may be presumed. *Id.*; Cf. *Gardner v. State*, supra at 690, n. 9.

■ In short we find that the prosecutor's use of the erroneous hypothetical in this cause, over appellant's objection, so

engage in the act that caused the death, he must also have specifically intended that death result from that conduct. See *Lugo–Lugo v. State*, 650 S.W.2d 72, 88 (Tex.Cr.App.1983) (Clinton, J., concurring). Under V.T.C.A.Penal Code, § 6.03(a), an accused may be said to act "intentionally, or with intent, with respect to ... a result of his conduct when it is his conscious objective or desire to ... cause the result." That an accused during the course of a robbery intentionally shot the clerk "in the leg," *Gardner*, supra, intentionally fired a shot into the ceiling, *Lane*, supra, or intentionally pulled the trigger of a firearm, as in the instant hypothetical, does not facially establish a "conscious objective or desire" that death should result.

4. Had appellant exercised peremptory challenges against every venireman who heard the hypothetical in this cause, nine out of his fifteen peremptory challenges would have been ex-

pended in an effort to remedy the damage. As it is, appellant still exhausted his peremptory challenges before jury selection was completed. The trial court granted him one additional peremptory challenge to make up for the fact that a venireman who had been accepted was later disqualified for reasons of health. After excercising this final peremptory challenge, appellant requested more, specifying the failure of the trial court to exclude, *inter alia*, veniremen Gragg, Toups and Kimble, and thus forcing him to use peremptory challenges to remove them. Under the holding in *Lane*, at 629, these veniremen should have been excluded. Subsequently appellant indicated he found the twelfth juror selected objectionable. Thus, "[t]he harm is evident and the error has been preserved." *Id.;* See also *Bell v. State*, 724 S.W.2d 780, 795 (Tex. Cr.App.1986).

distorted the lawful course of the whole voir dire that appellant was denied due course of law and effective representation of counsel as guaranteed by Article I, §§ 19 and 10 of the Texas Constitution.[5]

Accordingly, the conviction is reversed and the cause is remanded to the trial court for a new trial.

ONION, Presiding Judge, dissenting.

This is an appeal from a conviction for capital murder under V.T.C.A., Penal Code, § 19.03(a)(2), where the death penalty was imposed by the court following affirmative answers by the jury to special issues one and two submitted under Article 37.071(b), V.A.C.C.P.

The majority reverses the conviction upon appellant's fifteenth point of error in which the majority states the "appellant complains of a hypothetical question posed to a number of veniremen during the early portions of the voir dire which was intended to demonstrate the difference between a murder that is committed intentionally and one that is done deliberately." The point of error, however, reads:

"The trial court erred in permitting the State to use a purported example of capital murder during voir dire which eliminated 'intentionally commit the murder' element of the offense."

And the appellant points only to the voir dire examination of one venireman.

In argument submitted in his brief in support of the wording of his fifteenth point of error the appellant states:

"It is appellant's contention that the persons who enacted the capital murder statute certainly meant that before a death sentence could be enacted, a person would have to do more than inten-

---

**5.** In dissent, Presiding Judge Onion opines that we have misconstrued appellant's point of error number fifteen. We believe we have read appellant's complaint fairly, however. In his statement of this point of error appellant assailed the use of the hypothetical "during voir dire[.]" He did not specify the voir dire of any particular venireman. More significantly, he begins his discussion of point of error fifteen with the assertion that it is "the corollary to" his fourteenth point of error. In point of error fourteen appellant complained that he was not allowed to voir dire the veniremen based upon an understanding of the law of capital murder that would require a finding both that the accused "intentionally cause[d] the death[,]" *and* that he "intentionally commit[ted] the murder[.]" He contends that presentation to the veniremen of this understanding of capital murder under § 19.03(a)(2), *supra*, would have precluded use of any hypothetical that would permit conviction without the finding of a specific intent to kill. Appellant again directed our attention to the voir dire of venireman Wood, but also assigned as error the failure of the trial court to allow such questioning of each of 28 other veniremen, without setting out their voir dire. He argued that disallowing voir dire premised upon his understanding of the statute denied intelligent use of his peremptory challenges.

Obviously we find appellant's proposed definition of capital murder under § 19.03(a)(2), supra, to be untenable. See n. 3, *ante.* Thus we find no merit to his fourteenth point of error, as such. Nevertheless, the thrust of his complaint is that the State would have the veniremen believe they could convict on the basis of no more than "an intent to act, i.e., pull the trigger," whereas he would have them believe, correctly in our view, that the accused must also specifically intend to cause death. It is clear this complaint spans the course of the entire voir dire. It is reasonable also to construe his "corollary" point of error fifteen to embrace the whole voir dire proceeding, even though, as with point of error fourteen, he sets out in his brief only the voir dire of Wood. Moreover, because he posits his fourteenth point of error in terms, *inter alia*, of denial of the intelligent use of peremptory challenges, we think it reasonable to interpret his invocation of Art. I, § 10 of the Texas Constitution, in point of error fifteen, as a similar claim. See *Mathis v. State*, 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959); *Gardner v. State*, supra, at 690, n. 9.

Focusing exclusively on the three contaminated veniremen who actually sat on the jury, the dissent maintains that each was "rehabilitated" by further voir dire by defense counsel. We usually think of rehabilitation as the process of getting a venireman to retract, clarify or qualify an answer he has given which would otherwise subject him to a challenge for cause. Here it was not the veniremen's answers which subjected them to challenge for cause, but the prosecutor's faulty representation of the law, over objection (and, at least in the case of Wood, the further assurance that the trial court's overruling of appellant's objection meant Wood could "use or consider it"). *Lane,* supra. Suggesting a proper understanding of the law to a venireman on cross voir dire, once the trial court has already sanctioned the giving of another, *improper* one, can only serve to confuse him. There could be no retraction, clarification or qualification here; only obfuscation.

tionally do an act, such as pull a trigger of a gun (while in the course of committing robbery, etc.) i.e., the state's version of the statute. Surely the act must be committed with the ultimate design to take a life. In fact, the definitions of 'intentionally' and 'conduct' clearly indicate such a result, particularly when coupled with the way in which the capital statute is drawn.

"Intentionally is defined in § 6.03(a) of the Penal Code:

"'A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.'

'Conduct' is defined to mean 'an act or omission and its accompanying mental state'. Tex.P.Code, § 1.07(a)(8).

"The use of the term 'intentionally' in § 19.03(A)(2) clearly is more than a redundant application of the culpable mental state required in the § 19.02(a)(1) definition of murder and appellant would submit that it means what it says, i.e. 'intentionally commit the murder' as opposed to 'intentionally cause the death.'"

In support of his fifteenth point of error appellant sets out in his brief a particular portion of the voir dire examination of venireman Gary Mack Woods. That portion relied upon by appellant is as follows in its entirety:

"Q. (By Mr. Isenberg—Prosecutor) You've got that first example. I walk in the store, get the money, take the gun—it's my conscious objective or desire to pull the trigger on the gun. The bullet hits Mr. Scott. He bleeds to death. That's an example of when I intentionally caused the death of an individual while in the commission of a robbery.

"Here's example number two. I go into the Seven-Eleven. I get the money from Mr. Scott. I take the gun. I don't just fire at him, I take it and put it right up to his head. It's just an inch away from the side of his temple, and I pull the trigger and I blow his brains out. Under that fact scenario, the first part of intentionally engage in the conduct, conscious objective or desire to engage in the conduct, you bet. Second question: deliberately engage in the conduct with a reasonable expectation that death would occur, second example. Does that, perhaps, draw the distinction for you a little better?

"A. I see the distinction that you tried to get to, yes, sir. He deliberately shot him in the head knowing he was going to die or should die.

"Q. That's right. As opposed to just shooting at him and having the bullet hit him somewhere and then bleeding to death—

"MR. BRATTON (Defense Counsel): *If that's the example they're using of just shooting at him and him ended up bleeding to death, that's not capital murder and we would object to that example being used.* He could confuse this prospective juror, and we would ask that he be instructed to disregard that as even an example.

"THE COURT: *Disregard the statement of the prosecutor about shooting at somebody. It is not a capital murder.*

"Q. (By Mr. Isenberg) I didn't mean to change my example. The first example I gave you is where I shoot the gun. It's my conscious objective or desire to engage in the conduct. I pull the gun, the gun fires and hits Mr. Scott in the leg and then he bleeds to death. That's the example I meant for the first one.

"MR. BRATTON: Your Honor, we're going to object to that as, further, not being intentionally causing the death if all he's doing is shooting the gun and he doesn't intend to cause the death.

"THE COURT: Overruled.

"MR. BRATTON: That's under trial objection number one that we would make to the Court.

"THE COURT: That's denied.

"MR. BRATTON: Is that the same ruling as to that?

"THE COURT: Yes, sir.

"Q. (By Mr. Isenberg) I've got these two examples. The first example was where I walk in and I take the gun and I fire the gun. It's my intent to fire the gun to engage in that conduct or fire the gun. The bullet hits Mr. Scott in the leg and he bleeds to death, and I go out with the money. It answers the first question 'intentional'. It might or might not answer the second question of whether it was done deliberately with a reasonable expectation that death would occur.

"The second example—

"MR. BRATTON: Your Honor, *as to that first example,* we would, again, that it's not an intentional act and not a proper definition. Same objection.

"THE COURT: Overruled." (Emphasis supplied.)

It is this quoted portion upon which appellant relies to illustrate his point of error stated above.

It is observed that the objection to the voir dire examination of Woods which appellant complains of in his fifteenth point of error is "Your Honor, we're going to object to that, as further, not being intentionally causing the death if all he's doing is shooting the gun and he doesn't intend to cause the death" and "That's under trial objection number one that we would make to the Court." He tells us that the trial objection number one is to appellant's written objection to the "State's example of an act to pull the trigger." In such written objection we find that appellant complains that the example or examples used do not define capital murder as stated in V.T.C.A., Penal Code, § 19.03(a)(2), thus allowing a juror to be qualified under an improper standard preventing the appellant from properly challenging for cause or effectively using his peremptory challenges, thus depriving him of a fair and impartial jury as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 19 of the Texas Constitution and Article 35.16(a)(8) and (c)(2), V.A.C.C.P.

His last trial objection was "Your Honor, as to that first example . . . that it's not an intentional act and not a proper definition."

Following the initial voir dire examination by the State, appellant was permitted to voir dire Woods at length in which appellant gave Woods hypothetical examples of the law concerning capital murder, etc., which were correct and in accordance with the definition he had earlier urged. Woods indicated he understood and could follow the law. While appellant challenged Woods for cause, he accepted Woods as the eighth juror and did not exercise a peremptory challenge. At the time he had not exhausted his peremptory challenges. Woods' voir dire is the only prospective juror's examination set out under his expressly worded fifteenth point of error. Under this point of error appellant does not refer us to other prospective jurors,[1] despite the majority's assertion as to "a number of veniremen."

The majority seems to have substituted its own version of the fifteenth point of error. It quotes at length from *Gardner v. State,* 730 S.W.2d 675 (Tex.Cr.App.1987), fulfilling the prophecy of the concurring opinion in *Gardner* at p. 703. It also relies upon *Lane v. State,* 743 S.W.2d 617 (Tex. Cr.App.1987), involving a hypothetical question concerning the difference between intentional and deliberate murder. In the instant case the fifteenth point of error relates to a different question, and further and most importantly, unlike *Lane,* the appellant was not restricted or prevented from subsequently posing what he considered to be correct hypothetical questions concerning the same subject matter, and "rehabilitating" the prospective juror before he was accepted by the appellant without the use of a peremptory challenge. In his point of error he does not complain that the challenge for cause was improperly denied and that he was forced to take an objectionable juror.

No peremptory challenge was exercised and appellant had not exhausted such challenges at the time.

---

1. Nevertheless, the majority uses prospective juror Race's voir dire examination. Race, like Woods, was accepted by appellant as a juror.

The majority, using a different hypothetical than that referred to by appellant in his fifteenth point of error, writes and finds presumed harm:

"The hypothetical in the instant cause was in every instance given to the venireman during the State's voir dire, before appellant could even begin to question the particular venireman's ability to comprehend any genuine distinction between 'intentional' and 'deliberate.' Appellant was thus effectively precluded from mounting a challenge for cause in the ordinary sense against any of these veniremen on that basis. Indeed, as *Lane*, supra, establishes, the hypothetical given here actually *rendered* the veniremen challengeable for cause inasmuch as it instilled in them, under the trial court's auspices, a bias against the law. Furthermore, the hypothetical could only have corrupted the answers to the undeniably 'proper' questions appellant subsequently posed to each of the veniremen relative to his ability to comprehend a distinction between the two statutory terms, thus denying appellant the intelligent use of a significant portion of his peremptory challenges. *Smith v. State*, 703 S.W.2d 641, 643 (Tex.Cr.App.1985). Under the circumstances presented here, harm may be presumed. *Id.*; Cf. *Gardner v. State*, supra at 690, n. 9.

"In short we find that the prosecutor's use of the erroneous hypothetical in this cause, over appellant's objection, so distorted the lawful course of the whole voir dire that appellant was denied due course of law and effective representation of counsel as guaranteed by Article I, §§ 19 and 10 of the Texas Constitution."

First, it is observed that when prospective jurors in a capital murder case are examined on voir dire separate and apart, as in the instant case, it is customary and traditional that the State commence the voir dire examination. See Articles 35.17 and 35.13, V.A.C.C.P. Any hypothetical question posed by the State on initial interrogation of a prospective juror will always be before a defendant "could even begin to question the particular venireman's ability" about the same subject matter. How this well-established order of procedure effectively precludes a defendant from mounting a challenge for cause, as the majority suggests, is not clear. The majority indicates that the hypothetical (it has chosen in disposing of the fifteenth point of error) "actually *rendered* the veniremen challengeable for cause as it instilled in them, under the trial court's auspices, a bias against the law." The majority seems to be saying that if the State in explaining the law to a prospective juror, gives a hypothetical that is a "watered down" version of the law or is not totally correct, and the court overrules the objection thereto the prospective juror, whomever he or she might be, has forever instilled [2] in his or her mind a bias against the law, and that subsequent voir dire examination of proper examples or hypotheticals of the law by the defendant are of no avail because the earlier hypotheticals "could only corrupt the answers" to the later questions of the defendant. Apparently, under the majority's viewpoint, once the State's hypothetical (if improper at all) is made and the objection thereto is overruled, the die is cast and nothing can be done to save the day, particularly not the defendant's proper explanation of the law.

Anyone with experience in jury voir dire examination knows that often the examples given in explanation of the law by the State, the defendant, or even by the court are not always totally correct or even sometimes improper. And this occurs without bad faith on the part of any party.

If the rule established by the majority today is a good rule, does it work both ways? If, during the voir dire examination by a defendant, an improper or not totally correct example or hypothetical is given, and the State's objection thereto is overruled, then is the prospective juror subject to challenge for cause by the State? Sure-

---

**2.** "Instill" is defined as "1: to cause to enter drop by drop ... 2: to impart gradually." Web-ster's New Collegiate Dictionary (1980).

ly the improper hypothetical of the defendant could only have corrupted the answers to any later undeniably proper questions by the State, if the majority reasoning is carried to its logical ending.

Undoubtedly the majority does not so intend, for it finds the use of the erroneous hypothetical, over appellant's objection "so distorted the lawful course of the whole voir dire that appellant was denied due course of law and effective representation of counsel as guaranteed by Article I, §§ 19 and 10 of the Texas Constitution." [3]

Since the State has no right to either due course of the law of the land or the effective assistance of counsel, the majority's answer is clear. The State has no such right.

The majority also contends that the asking of the hypothetical and the ruling by the court denied the appellant the intelligent use of a significant portion of his peremptory challenges. "A peremptory challenge is made to a juror without assigning any reason therefor." Article 35.14, V.A.C.C.P.[4] The appellant in this cause did not assign reason at trial for any of his peremptory challenges. He was not required to do so. We know now why such challenges were utilized. As to juror Woods, he was accepted by the appellant as a juror without the exercise of an available peremptory challenge. Juror Race mentioned in the majority opinion was the first juror chosen. He was accepted without either challenge for cause or the exercise of a peremptory challenge by the appellant. Juror Hanneken was also accepted by appellant without the exercise of an available peremptory challenge. These three jurors, interrogated individually and separate and apart from other members of the jury panel, were the only prospective jurors who actually served on the jury after the use of the hypothetical in the fifteenth point of error or the one set forth by the majority opinion. Each was "rehabilitated" by the appellant in his voir dire examination and indicated they understood the law as described by appellant's counsel and said they could follow it. It is difficult to see how the use of either hypothetical "so distorted the lawful course of the whole voir dire" so as to deny appellant the effective representation of counsel or the due course of law.

If the circumstances here present presumed harm, it may be difficult or even impossible to select a criminal trial jury in the future without reversible error.

Other new and dangerous case law continues to be created, see e.g., *Goode v. State*, 740 S.W.2d 453 (Tex.Cr.App.1987), and even other newly adopted rules do not work both ways. See *Polk v. State*, 813 S.W.2d 749 (Tex.Cr.App.1988).[5]

---

**3.** *Interestingly enough, the objection made at trial and on appeal should be contrasted with the majority's holding. The appellant does not expressly mention or argue that he was denied the effective representation of counsel or due course of the law of the land. The majority makes its own choice and limits its holding to state constitutional issues for obvious reasons. There will be no federal review of this holding.*

**4.** *Now see Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.ED.2d 69 (1986). The State may now be required under certain circumstances to disclose its reasons for peremptory challenges. The defendant is not so required.*

**5.** *Polk, supra, held that the Benson (661 S.W.2d 708 [Tex.Cr.App.1982]), Boozer (717 S.W.2d 608 [Tex.Cr.App.1984]), and Marras (741 S.W.2d 395 [Tex.Cr.App.1987]) line of cases that the sufficiency of the evidence is to be measured against the charge of the court does not apply, despite a lack of objection by the defendant, where the charge authorizes conviction on less* than the law requires. In such cases the standard is the old standard that the sufficiency of the evidence is measured against the allegations of the indictment. In the *Benson–Boozer–Marras* line of cases the majority of this Court held that where the court's charge required more than the allegations of the indictment and more than the laws required for a conviction, and the State does not object, the sufficiency of the evidence must be measured against the charge of the court. Even if the "more" is found by the jury beyond a reasonable doubt, appellate court will reverse on the sufficiency of the evidence if no rational trier of fact could have found the "more" beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). And this is true even if the "more" is not an essential element of the offense, and all the essential elements of the offense are proved and supported by the verdict of the jury. The conviction must nevertheless fall in such cases because the State did not object to the court's charge. Where the charge requires

Because the majority advances its own point of error rather than the one urged by appellant and for all the other reasons discussed, I dissent to the reversal of this capital murder conviction on this point.

DAVIS, J., joins this opinion.

MILLER, J., joins this opinion except for that part dealing with footnote # 5.

less rather than "more," and the defendant fails to object, the rule that the sufficiency of the evidence is measured against the charge does

not apply as made clear in *Polk.* There appears to be different standards applied depending upon whose ox is gored.