Regalado v. State 















IN THE
TENTH COURT OF APPEALS
 

No. 10-91-025-CR

        RUDOLPH REGALADO,
Appellant
        v.

        THE STATE OF TEXAS,
Appellee
 

From the 40th District Court
Ellis County, Texas
Trial Court # 18,093
                                                                                                    

O P I N I O N
                                                                                                    

          Rudolph (Rudy) Regalado received sixty years in prison for murdering his brother, Roy. 
He contends the evidence is insufficient to prove that he knowingly and intentionally committed
the murder and to disprove that he acted in self-defense. Other complaints relate to the selection
of the general venire, errors in the charge, and the admission and exclusion of evidence. We will
affirm.
          Between 9:00 and 9:30 p.m. on July 23, 1990, James Chenault heard three rapid gunshots. 
He heard a fourth gunshot just as he walked out of his house. The gunshots sounded like they
came from a roadside park on Highway 77, about 200 to 300 yards from Chenault's home. Roy
Regalado's body was found in the park the next morning by passing motorists.
FORENSIC EVIDENCE
          Roy had been shot at least three and possibly four times with a .38 pistol. Bullets test-fired
from Rudy's .38 pistol matched two bullets taken from Roy's body during an autopsy. One
gunshot entered the body from the back to the front, the track of the bullet angling left to right and
downward. The medical examiner said this wound was not "rapidly fatal." Based on the
gunpowder residue on a t-shirt, an expert estimated that Roy was shot in the back from a distance
of two to three feet. The downward track of the bullet indicated that he was shot while either
sitting or falling or by someone holding the pistol at a higher elevation.
          A second bullet entered the front of the chest just above the left nipple. This was the
mortal wound. The absence of gunpowder on the t-shirt made it impossible to estimate the
distance from which he was shot in the chest. Soot and gunpowder stained the third and index
fingers of the left hand, indicating that the weapon was only two to three inches away from the
hand when the shot was fired. The hand wound was consistent with a "reflective or defensive
action," according to the medical examiner, a wound usually caused by a person putting his hand
in front of the weapon just before he is about to be shot at close range. This hand wound indicated
that Roy knew he was about to be shot at close range. The medical examiner said the bullet could
have passed through the fingers and entered the chest above the left nipple, which would explain
why there was no gunpowder residue on the front of the t-shirt but only on the hand. Another
bullet entered the back of the left forearm and exited through the elbow. The medical examiner
agreed that this bullet could have entered the body after exiting through the elbow.
          The blood-alcohol content of the body was .21. The slightly higher alcohol content of the
vitreous eye fluid indicated that Roy had stopped drinking approximately two hours before his
death. A forensic serologist found blood spots on the toes of Rudy's shoes. 
                                                   RUDY'S VERSION
          Rudy Regalado gave this version of what happened. Roy came to Rudy's house around
3:00 p.m. on July 23 and asked Rudy to drive him to their sister's home where Roy was working
on her house. Rudy refused because their sister had warned Rudy to stay away from her home. 
Rudy agreed, however, to take Roy to get some beer, after which they rode around the country
side drinking beer. Roy got "angry drunk" and began yelling at passing cars. Rudy, who was
also drunk, refused to allow Roy to drive. Because they were too drunk to drive and Rudy was
getting sick, Rudy stopped his car at a roadside park where Roy continued to drink.
          Rudy and Roy both got out of the car, but Rudy later sat in the driver's seat so Roy would
not attempt to drive away. Roy started cussing Rudy when he refused to let him drive. Rudy took
his .38 pistol and two shells from under the driver's seat, loaded the shells into two empty
chambers, and apparently placed the weapon back under the driver's seat.
          Rudy then fell asleep but was awakened by Roy's leaning against the car by the front
passenger's window. Roy told him, "I'm going to kill you, you son of a bitch," opened the front
passenger's door, and lunged at Rudy with a knife in his hand. Rudy hit Roy, grabbed the pistol
from under the driver's seat, and escaped from the car while Roy was trying to grab him. Rudy
ran around the back of the vehicle and saw Roy by the driver's side but soon lost sight of him. 
Rudy climbed onto a bench next to a nearby covered picnic table and yelled, "Roy, what's wrong
with you?" He fired two "warning shots" while standing on the bench, both of which struck and
creased the top of his car. Rudy was not aiming at Roy but merely trying to scare him. 
          Not knowing where Roy was, Rudy went to the car and looked inside and under the
vehicle. When he walked around the car carrying the pistol in his left hand, Roy suddenly "rushed
him." Rudy, who thought Roy still had the knife, struck his brother with his right hand, causing
Roy to lose his balance. As Roy started to fall, he grabbed for Rudy's pistol, pulled it, and the
pistol accidently fired. Rudy did not intend to fire this third shot.
          When Roy appeared to be coming after him again, Rudy fired a fourth shot "immediately"
and quickly got into his car and drove away. When he fired this final shot, Roy was standing up
straight. He emptied the four fired shell casings from the pistol but did not reload. After driving
around aimlessly—drinking beer and contemplating suicide—Rudy finally drove home. He asked
his wife whether she had received any phone calls and then "passed out." 
          When he awoke the next morning, Rudy told his family what he thought had happened,
although he was not sure. He did not know whether he had injured or killed his brother. Rudy
called police, learned that Roy was dead, and asked to have policeman Larry Baugh contact him. 
Baugh was talking to Rudy when Sheriff's deputies arrived to arrest him for Roy's murder. 
Officers found Rudy's .38 pistol and a knife wrapped in a towel lying on a coffee table in the room
where Rudy and Baugh were talking. The pistol contained two live cartridges but no spent shells. 
Rudy had retrieved the knife from his car's floorboard and wrapped it and his pistol in the towel.
          Rudy, who always carried a pistol because of threats from his sisters, thought Roy was
going to kill him and feared for his safety. He knew Roy had already killed a man and had been
to prison. He claimed, however, that he and Roy had a good relationship, but he knew that Roy
could become violent when he was drunk. Rudy served three years of a ten-year sentence in the
early 1980s for delivery of a controlled substance.
OTHER WITNESSES
          Policeman Larry Baugh testified that Rudy told him, "I think I have messed up," that his
brother had pulled a knife, and that he shot him. Rudy's sister, Carmen, who said she hates Rudy,
said that Rudy routinely carried a pistol, that he had a problem with alcohol, and that Roy was
against the use of knives and guns. She admitted, however, that Roy had shot and killed a man. 
Another sister, Irene, said that Rudy had "violent tendencies" and that he had broken her arm once
when he intervened in a fight between her and another sister. His sister, Helen, said that Rudy
and Roy had a good relationship and confirmed that Carmen hated Rudy. She described Roy as
a violent person when drinking.
          Maria, Rudy's wife, testified that he arrived home drunk around 1:00 a.m. on July 24 and
went to bed. He told her the next morning that Roy had attacked him with a knife, that he was
not sure he had killed him, but that he believed something had occurred. However, in her July
24 statement to police, Maria said that Rudy told her that he "thought he had killed his brother." 
          Rudy's step-daughters also testified about his statements and actions on the morning after
the shooting. Theresa said that he called the family together and told them he had done something
bad, but that he was not sure. Nancy gave the same testimony as Theresa, except she said that
Rudy told them Roy had started the fight. Adriana generally repeated her sisters' testimony, but
in her written statement to police, she did say that Rudy told the family he had killed his brother. 
She also described how Rudy left the house and then came back inside carrying a towel in his
hands. He laid the towel on the coffee table.
EVIDENTIARY POINTS
          A person commits murder if he intentionally or knowingly causes the death of an
individual. Tex. Penal Code Ann. § 19.02(a)(1) (Vernon 1989). The State charged Rudy with
intentionally and knowingly causing Roy's death by shooting him with a firearm. Rudy contends
in his first two points that the evidence is insufficient to prove the requisite knowledge and intent. 
His argument is essentially that the State failed to present any evidence to contradict his testimony
that he did not intend to shoot or kill his brother and that there is no evidence he intended to cause
death or even knew his actions had resulted in death. Furthermore, he contends the evidence
shows his actions were either accidental or in self-defense.
          Murder under section 19.02(a)(1)—that is, intentionally or knowingly causing death—is
a result-of-conduct offense, which requires proof that the accused intended to engage in the act
causing death and to have specifically intended that death result from that conduct. Morrow v.
State, 753 S.W.2d 372, 375-76 n.3 (Tex. Crim. App. 1988). A person acts intentionally, or with
intent, with respect to a result of his conduct "when it is his conscious objective or desire to . .
. cause the result." Tex. Penal Code Ann. § 6.03(a) (Vernon 1974). He acts knowingly, or
with knowledge, with respect to a result of his conduct "when he is aware that his conduct is
reasonably certain to cause the result." Id. § 6.03(b). 
          Culpable mental states must usually be inferred from the circumstances surrounding the
prohibited act. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), cert. denied,
112 S.Ct. 2944 (1992). Intent to kill may be inferred from the accused's acts, words, and
conduct. Id. It also may be inferred from the use of a deadly weapon per se. Moreno v. State,
755 S.W.2d 866, 868 (Tex. Crim. App. 1988). Roy was shot several times at close range. Rudy
admitted knowingly and intentionally shooting him just before fleeing the scene. Viewing the
evidence in the light most favorable to the verdict, as we must, we hold that a rational fact-finder
could have found beyond a reasonable doubt that Rudy fatally shot Roy with a pistol—a deadly
weapon per se—and that he intentionally and knowingly caused his death. See id. at 867. 
Moreover, Rudy's testimony that he did not intend to kill and that he acted in self-defense did not
result in the State's evidence of his intent being insufficient—the jury could either accept or reject
his testimony. See Saxton v. State, 804 S.W.2d 910, 912 (Tex. Crim. App. 1991). We overrule
the first two points.
          Rudy's third point questions the sufficiency of the evidence to "disprove" his claim of self-defense. Again, he bases this point on the perceived failure of the State to contradict his assertions
that he acted in self-defense. 
          Self-defense is a plea of justification, not an affirmative defense. Tex. Penal Code Ann.
§§ 2.03, 9.31 (Vernon 1974). Consequently, once raised by the evidence, the state must persuade
the jury of its non-existence beyond a reasonable doubt. Whiting v. State, 797 S.W.2d 45, 48
(Tex. Crim. App. 1990).
          The jury was not bound to accept Rudy's protestations that he acted in self-defense. See
Saxton, 804 S.W.2d at 912. Moreover, forensic evidence established that Roy was shot in the
back, at a range close enough to leave a powder residue on his t-shirt, and that the fatal shot to the
chest was delivered while Roy held out his hand in a futile defensive action. This physical
evidence is inconsistent with a claim of self-defense. One of Rudy's step-daughters described how
she saw him go to the garage and bring back something wrapped in a towel. The knife, which
Rudy claimed Roy attacked him with, was found wrapped in the towel with the pistol and lying
on a nearby table when police arrived. Rudy said he retrieved the knife and pistol from his car. 
There was evidence, however, that Roy kept knives similar to the one found wrapped in the towel
in Rudy's garage. This evidence, particularly that Rudy may have obtained the knife from the
garage after arriving home following the shooting, counters the claim of self-defense. Finally,
Rudy's own actions following the shooting, when he made no effort to notify law enforcement
officers of the shooting or to summon help, are likewise inconsistent with a plea of justification. 
Viewing the evidence in the light most favorable to the verdict, we hold that the jury could have
found beyond a reasonable doubt that Rudy did not act in self-defense. Point three is overruled.
 
THE CHARGE
          Although the charge contained an abstract instruction on self-defense and informed the jury
in the abstract that a defendant is presumed to be innocent until his guilt is established by legal
evidence beyond a reasonable doubt, it did not specifically assign the burden of proof to the State
or explicitly require the State to disprove the claim of self-defense beyond a reasonable doubt. 
Nor did it place the burden on the defendant. Rudy's fourth point is that the court erred when it
failed to charge the jury on the burden of proof, a complaint not raised in his objections to the
charge. Thus, to obtain a reversal, he must prove egregious harm, which is equivalent to showing
that an unobjected-to charging error denied him a fair and impartial trial. See Almanza v. State,
686 S.W.2d 157, 171 (Tex. Crim. App. 1986) (on rehearing). Egregious harm is determined on
a case-by-case basis by reviewing the charge in its entirety, the state of the evidence and its
probative weight, the contested issues, the arguments of counsel, and any other relevant
information revealed by the record. Id.
          Considering the charge as a whole, it did not misplace the burden of proof but just failed
to explicitly assign it to the State. During jury selection and the arguments on guilt-innocence,
both the prosecutor and the defense repeatedly reminded the jury that the State had the burden of
proving Rudy's guilt beyond a reasonable doubt. There is nothing in the record to indicate that
the jury was mislead either by the charge or comments of counsel into believing that the defense
had any burden of proof whatsoever. Neglecting to instruct the jury that the State had the burden
of disproving self-defense beyond a reasonable doubt is not a Cobarrubio-type error that does
result in egregious harm. See Moore v. State, 694 S.W.2d 528, 530 (Tex. Crim. App. 1985);
Cobarrubio v. State, 675 S.W.2d 749 (Tex. Crim. App. 1984) (holding the defendant was
egregiously harmed by a charge that failed to instruct the jury that the state had burden of negating
sudden passion as an element of murder). The failure to specifically assign the burden of proof
to the State did not deny Rudy a fair and impartial trial. We overrule point four.
          The court gave the jury a broad abstract instruction on the right of self-defense and applied
that instruction to the facts. Rudy's sixth point contains complaints that the court should have
submitted his requested instructions on the right to arm himself, the right to pursue his attacker,
and the right to continue shooting. The instruction given, both in the abstract and in its application
to the facts, fairly charged the jury on the law of self-defense—the essence being that Rudy must
be acquitted if the jury believed or had a reasonable doubt on whether he acted in self-defense. 
Under the circumstances, giving the requested instructions would have been repetitious, and were
thus properly refused. See Philen v. State, 683 S.W.2d 440, 445 (Tex. Crim. App. 1984). Point
six is overruled.
          The charge contained four separate verdict forms, two applicable if the jury answered
"true" to the enhancement paragraph and two applicable if the enhancement paragraph was found
"not true." The following form could be used if the jury answered "true": 
We, the Jury, having found the defendant guilty as charged . . . in the indictment, do
further find that the allegations in [the enhancement paragraph] are `true' and we assess
his punishment at confinement in the Penitentiary at Life and a fine of $ .

A similar form, with the maximum sentence of "Life" already typed in, was also provided for the
jury's use if they found the enhancement to be "not true." The jury, however, used the following
form in assessing Rudy's punishment:
 
We, the Jury[,] having found the defendant guilty as charged in . . . the indictment, do
further find the allegations in [the enhancement paragraph] are `true' and we assess his
punishment at confinement in the Penitentiary for 60 years and a fine of none .

          Rudy objected to the verdict forms with the pretyped "Life" sentences on the ground that
they were improperly "suggestive" of a life sentence, but his objections were overruled. His
eighth point is based on the overruling of his objections. 
          Assuming, without deciding, that the verdict forms with the pretyped maximum sentence
of life were erroneous, the question is whether Rudy suffered "some harm" from their use. See
Almanza, 686 S.W.2d at 171. Considering the charge as a whole, the probative weight of the
evidence, the contested issues, the arguments of counsel—and, especially, that the jury did not use
either form to assess punishment—we find he did not suffer any harm from the assumed charging
error. We overrule point eight.
ADMITTING AND EXCLUDING EVIDENCE
          The State called Royce Gothard, a Sheriff's investigator, to testify about statements Rudy
made to Gothard while he was under arrest. Outside of the jury's presence, Gothard related that
Rudy told him he had gone to sleep in the driver's seat of his car at the roadside park and later
awoke to find Roy standing beside the front passenger's door with a knife in his hand. When Roy
threatened to kill him, Rudy said he struck his brother in the face, knocking him back from the
car, at which time Roy dropped the knife to the ground. According to Gothard, Rudy stated that
he jumped out of the car and started shooting at Roy who was running away. Rudy had loaded
his pistol and laid it in the seat beside him. Rudy's statements, made after Gothard gave him a
Miranda warning, were not reduced to writing or recorded. Gothard said that Rudy refused to
make a written statement but claimed that the statements were made voluntarily and without
coercion. Gothard admitted, however, that Rudy wanted to talk to a lawyer, but Gothard could
not recall whether he said that before or after he made the statements. 
          Rudy objected to the admission of the statements on the grounds that they were
inadmissible under article 38.22 and were made after he had requested a lawyer. See Tex. Code
Crim. Proc. Ann. art. 38.22 (Vernon 1979). He contends in point five that the statements were
improperly admitted over his objections. The State argues that the statements were admissible
under section 5 of article 38.22 that provides in part: "Nothing in this article precludes the
admission . . . of a voluntary statement, whether or not the result of custodial interrogation, that
has a bearing upon the credibility of the accused as a witness." Id. at art. 38.22 § 5. 
          Article 38.22 is inapplicable in determining whether voluntary in-custody oral statements
of the accused, given after a Miranda warning, are admissible to impeach the accused. Garrett
v. State, 682 S.W.2d 301, 305 (Tex. Crim. App. 1984). Their admissibility is authorized by the
portion of section 5 quoted above. See id.
          A court is the exclusive judge of the credibility of witnesses at a suppression hearing. 
Gibbs v. State, 819 S.W.2d 821, 830 (Tex. Crim. App. 1991), cert. denied, 112 S.Ct. 1205
(1992). Accordingly, the court could have reasonably found that the statements were voluntarily
made after a Miranda warning was given, that they were made to Gothard before Rudy said he
wanted a lawyer, and that the statements were admissible to contradict earlier testimony by Rudy
about how the shooting occurred. The statements were thus properly admitted over the objections. 
Point five is overruled.
          Rudy complains in point nine that the court abused its discretion when it allowed Carmen
Regalado, Rudy's sister, to testify over his objection that she had violated "The Rule." See Tex.
R. Crim. Evid. 613; Tex. Code Crim. Proc. Ann. art. 30.06 (Vernon 1981).
          Out of the jury's presence, defense counsel questioned Carmen and several other witnesses
about conversations they allegedly had in violation of The Rule. Carmen admitted asking her
husband, who heard the forensic expert's testimony, about the shirt Roy was wearing when he was
killed; Carmen's husband admitted "sort of" telling her what the pathologist said about the gunshot
wounds and trajectories of the bullets, but denied answering her other questions. Kathy Garza,
Carmen's daughter, denied telling her mother anything about the doctor's testimony, but admitted
asking her mother about the location of Roy's wounds. Tonya Zambrano, another witness, denied
hearing anyone tell Carmen about what transpired in court, but admitted telling her mother,
Lorene Valez, about the police officers' testimony concerning the date Roy was shot and the date
his body was found. Following the hearing, Rudy objected to Carmen Regalado as a witness
because she had violated The Rule, but the court overruled his objection and allowed her to testify. 
Carmen's testimony concerned Rudy's habit of carrying a pistol, his problem with alcohol, and
Roy's aversion to the use of knives and guns.
          Carmen's testimony did not bolster or contradict the testimony of the forensic expert, the
pathologist, or the police officers, the only witnesses whose testimony was apparently disclosed
to her in violation of The Rule. A court abuses it discretion if it allows a witness to testify over
a timely objection who (1) either heard or is made aware of the testimony of another witness and
(2) whose testimony contradicts the testimony of an opposing witness he actually heard or is aware
of or corroborates the testimony of a witness he actually heard or is aware of from the same side
on an issue bearing on guilt or innocence. Guerra v. State, 771 S.W.2d 453, 475 (Tex. Crim.
App. 1988). Under the circumstances, no abuse of discretion occurred because Carmen
Regalado's testimony did not corroborate the testimony of any witness whose testimony had been
disclosed to her or contradict the testimony of any defense witness of which she was made aware. 
We overrule point nine.
    In his tenth point, Rudy complains about the court excluding evidence relating to Roy's violent
character. He waived any complaint by failing to preserve the excluded testimony in a bill of
exceptions or an offer of proof. See Tex. R. App. P. 52(b). Point ten is overruled.
JURY PANEL
          Rudy objected to the venire on the ground that it did not represent a fair cross-section of
the community because, out of fifty potential jurors, it only contained one juror with an Hispanic
surname. Defense counsel testified in support of his objection that the community contained about
twenty-percent Mexican-Americans. Rudy contends in point seven that he is entitled to a reversal
because he made a prima facie showing of disparity and that the State offered no explanation for
the disparity.
          To establish a violation of the Sixth Amendment's right to a jury drawn from a fair cross-section of the community, the record must show a systematic exclusion of a particular racial group
from the jury-selection process. May v. State, 738 S.W.2d 261, 269 (Tex. Crim. App. 1987). 
Assuming that Rudy has shown a disproportionate representation in a single venire, that does not
show the necessary systematic exclusion. See id. Point seven is overruled.
          Having overruled all points, we affirm the judgment.
 
                                                                                 BOB L. THOMAS
                                                                                 Chief Justice
Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed March 3, 1993
Do not publish