**Curtis Paul HARRIS, Petitioner,**

v.

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE, et al., Respondents.**

Civ. A. No. 88–2925.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 22, 1992.

Jones, Day, Reavis & Pogue, Kevin D. McDonald, Washington, D.C., Brett A. Ringle, Dallas, Tex., for petitioner.

Bob Walt, Andrea L. March, Asst. Attys. Gen., Austin, Tex., for respondents.

## OPINION ON DENIAL OF HABEAS CORPUS

HUGHES, District Judge.

1. *Introduction.*

The state of Texas plans to execute Harris for the murder of Tim Merka in 1978. After convicting him of capital murder, the jury sentenced him to die. On appeal, the Texas Court of Criminal Appeals reversed his conviction and remanded for a new trial. At his second trial, a jury again found Harris guilty and sentenced him to death. The Texas Court of Criminal Appeals reversed the second conviction, but then affirmed it on the state's motion for rehearing. The United States Supreme Court denied Harris's petition for a writ of certiorari. The state trial court denied Harris's application for a writ of habeas corpus, and the Texas Court of Criminal Appeals affirmed.

This court granted a stay on Harris's first federal petition for habeas relief because the United States Supreme Court was deciding cases that could have affected Harris. This court lifted the stay, and in his amended petition, Harris makes eight categories of constitutional claims:

 A. The Texas death sentence statute is unconstitutional.

 B. The prosecutor violated the Constitution during voir dire.

C. The composition of the grand jury was not a fair cross section of the community.

D. The trial court violated the Constitution by failing to instruct the jury on additional lesser offenses.

E. The prosecutor suppressed material evidence, violating the Constitution.

F. The prosecutor violated the Constitution by not disclosing the state's agreement with Rencher.

G. He did not receive effective counsel.

H. The state appellate court arbitrarily reversed its ruling on the separation of jurors claim, violating his right to due process.

Categories A and D are procedurally barred because Harris failed to preserve properly his claims in the state courts. The court has reached the merits of these claims only in the alternative. All of his claims fail on the merits. His petition will be denied.

2. *Role of the Court.*

■ The writ of habeas corpus is an exceptional writ. Since before the Constitution in 1789, the writ has protected individuals from wrongful punishment. The writ allows individuals to challenge their criminal convictions on the grounds that they were convicted and sentenced in violation of federal law. The writ gives the federal courts limited power to reconsider a state's trial and appellate processes.

■ The state of Texas has the power to kill a person as punishment. If that decision is constitutionally sound, both in substance and in process, it must be affirmed by the federal courts. Texas is wholly bound by the United States laws and Constitution. This court's narrow, yet careful, review exists only to ensure that the state afforded full constitutional protection to a man it sentenced to die. The standards must be high when the penalty is death.

3. *Background.*

On December 11, 1978, Curtis Harris along with his brother, Danny, his girl-friend, Valarie Rencher, and a friend, James Manuel, were attempting to drive back from a visit to a friend's home when their car would not start. The group asked a man in a nearby house whether he had jumper cables; the man said he did not. The foursome started walking down the middle of the road when Danny Harris flagged down an approaching pickup truck driven by Tim Merka. For over twenty minutes, Merka tried to jump start the car. The three men went behind the car, and Danny told Harris, "We going to drive this man." Danny pushed Merka to the ground and pinned him there while Harris hit Merka in the head with an automobile jack. Still conscious, Merka asked what they wanted. Harris hit him again, this time hard enough to kill him. After seeing the first two blows, Rencher got in the pickup truck where she heard and saw Harris hit Merka in the head at least six more times.

The three men joined Rencher in the truck and drove to the Harris home in Bryan where Harris and Danny changed clothes. They all then drove to Waller, where the three men robbed a U–Totem grocery store around 11:00 p.m., using the shotgun they took from Merka's truck. After the robbery, when Manuel got out of the truck, he took the shotgun with him. Harris, Rencher, and Danny drove back to the Harris house in Bryan where they spent the rest of the evening.

4. *Procedural Default.*

On Harris's state application for habeas corpus relief, the Texas Court of Criminal Appeals held that Harris was procedurally barred from complaining of the constitutionality of the Texas death sentence statute or of the trial court's unconstitutional failure to instruct the jury on lesser included offenses. Harris failed properly to preserve his complaints because he did not both (a) object to the errors at the time of trial or ask for an instruction and (b) raise the issues on direct appeal.

■ To elevate the importance of the state court proceedings and to maximize the utility of scarce judicial resources, the federal courts may decline to hear claims

that have been waived by the applicant. When a petitioner failed to act in his own interest at the proper time, where he initially could have raised an objection to some part of the proceeding, the claim will not be heard. When a state court "clearly and expressly" indicates that it is denying relief on the basis of a procedural default, federal habeas review of the issue may also be barred. *Harris v. Reed,* 489 U.S. 255, 260–64, 109 S.Ct. 1038, 1041–44, 103 L.Ed.2d 308 (1989).

▮ Under Texas law, if a defendant does not properly preserve his complaint at the trial by making a timely objection to the error or omission, the defendant has no right to raise the point on direct appeal or in postconviction applications for a writ of habeas corpus. *Ex parte Dutchover,* 779 S.W.2d 76, 77 (Tex.Crim.App.1989); *Ex parte Crispen,* 777 S.W.2d 103, 105 (Tex. Crim.App.1989); Tex.R.App.P. 81(b)(2). Even a constitutional claim may be waived by failure to object at the time of trial. *Mathews v. State,* 768 S.W.2d 731, 733 (Tex.Crim.App.1989); *Little v. State,* 758 S.W.2d 551, 563 (Tex.Crim.App.), *cert. denied,* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988); *Russell v. State,* 665 S.W.2d 771, 778 (Tex.Crim.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). In Texas, a petitioner also waives his right to consideration of his application for habeas corpus on a claim that he did not raise on direct appeal. *See Ex Parte Bravo,* 702 S.W.2d 189, 193 (Tex. Crim.App.1982).

▮ Before federal courts will review claims that the state courts have found procedurally defaulted, a petitioner must be able to demonstrate that (a) a good reason for his not raising the claims at the trial existed and that (b) prejudice resulted. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). Harris makes no attempt to show either cause or prejudice. The Supreme Court has also held that in an extraordinary case, a court may grant a writ, even in the absence of a showing of cause, if a constitutional violation has probably resulted in the conviction of one who is actually inno-

cent. *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). Harris does not contend that he is innocent. The merits of these claims are reached only in the alternative.

### 5. *Texas Capital Sentencing Statute.*

Harris argues that the special interrogatories of the Texas statute unconstitutionally precluded (a) the jury from considering mitigating evidence, (b) his attorneys from offering other mitigating evidence, and (c) reliable sentencing because of unascertainable dispositive terms.

### A. *Mitigating Evidence.*

In Texas, capital juries are asked two questions to determine whether the death penalty should be imposed. Harris's jury was asked:

(1) Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result? and

(2) Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Tex.Code Crim.Proc.Ann. art. 37.071(b) (1981). These questions are asked to narrow the inquiry to socially acceptable grounds for the harshest of penalties and to eliminate arbitrary or reactionary impositions. The Texas scheme directs the jury to form a reasoned moral response instead of a sentimental idiosyncratic reaction.

▮ The Constitution requires a vehicle for the jury to register its evaluation of the mitigating evidence. *Penry v. Lynaugh,* 492 U.S. 302, 316, 109 S.Ct. 2934, 2945, 106 L.Ed.2d 256 (1989); *Jurek v. Texas,* 428 U.S. 262, 270–71, 96 S.Ct. 2950, 2955–56, 49 L.Ed.2d 929 (1976). The jury must be allowed to consider anything the defendant wishes to offer that would help it exercise a "reasoned moral response" to the defendant's personal culpability. *Penry,* 492 U.S. at 319, 109 S.Ct. at 2947, *citing California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987). Some mitigating factors, like pro-

found retardation, cannot be properly accounted for in these two special issues. *See Penry*, 492 U.S. at 328, 109 S.Ct. at 2951–52. If the mitigating thrust of the evidence is beyond the scope of the special issues, the court must give an additional instruction so that the jury can give that evidence proper mitigating effect. *See Penry*, 492. U.S. at 319–28, 109 S.Ct. at 2947–52; *Graham v. Collins*, 950 F.2d 1009, 1027 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2937, 119 L.Ed.2d 563 (1992).

▮▮▮▮ The special interrogatories are purposefully narrow in an attempt to curb socially stereotypical mercies and biases. Without them, a jury might irrationally decide that "whiteness" was a mitigating factor or that "blackness" was an aggravating factor. If the jury answers both special issues "yes," the sentence of death is mandatory. The jury may not chose life over death based on a sentimental appraisal of life's abrasions, even extraordinary ones, unless those abrasions might lessen a defendant's moral culpability, yet still promote "yes" answers to the narrowing questions.

### (1) *Harris's Role in the Offense.*

Harris argues that the jury could not give mitigating effect to evidence that he may not have actually killed Merka. His supporting evidence is that he was only one of two people who bludgeoned Merka. It is possible, Harris contends, that although he hit Merka at least eight times with an automobile jack, no hit was fatal.

Both special interrogatories provide a vehicle by which the jury could give mitigating effect to the possibility that Harris did not actually physically inflict the injury that killed Merka. *Bridge v. Collins*, 963 F.2d 767, 769–70 (5th Cir.1992). Within the first question, the jury could have found that, because Harris did not personally deliver the fatal blow, he did not deliberately beat Merka in the head with the intent to kill him. Within the second question, the jury could have found that, because Harris did not deliver the fatal blow, he would not be dangerous in the future. The jury did

not reach either conclusion. Whether Harris actually killed Merka, the jury decided that Harris acted deliberately and with the intent that death result and that he would be dangerous to society in the future.

In a related claim, Harris asserts that the jury had to apply unconstitutionally the law of the parties at the punishment phase in order to sentence him to death. The law of the parties says that a person is criminally responsible for the crime of another if he acted with intent to assist in the crime. Tex.Penal Code Ann. § 7.02(a)(2) (1974). The first special interrogatory to the jury asked:

> Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that the death of the deceased or another would occur?

Harris argues that because the question at the sentencing phase asked about the conduct that "caused the death," the jury would assume that causation was irrelevant by attributing to Harris the deliberateness of Danny. Harris's argument is convoluted and wrong. Under his logic, no person convicted for a joint crime could be sentenced to death.

The law of the parties does not apply at the punishment phase in a capital murder case. *Green v. State*, 682 S.W.2d 271, 287 (Tex.Crim.App.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). At the punishment phase, the jury must find that each defendant's conduct was deliberate, not just intentional. *See Williams v. State*, 674 S.W.2d 315, 320 (Tex.Crim. App.1984).

The Texas legislature and courts have recognized that each party to a capital offense can engage in deliberate conduct even if it is undisputed that only one party dealt the fatal blow. Tex.Code Crim.Proc. Ann. art. 37.071(b)(1) (1981); *Belyeu v. State*, 791 S.W.2d 66, 74 (Tex.Crim.App. 1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 1337, 113 L.Ed.2d 269 (1991). The jury must consider the defendant's conduct in aiding, encouraging, or directing the killing

to determine whether he engaged in that conduct deliberately and with the expectation that death would result. *Martinez v. State*, 763 S.W.2d 413, 420 n. 5 (Tex.Crim. App.1988). The evidence must show that the defendant's individual conduct constituted a conscious decision, more than mere will or intent, to cause death. *Nichols v. State*, 754 S.W.2d 185, 201 (Tex.Crim.App. 1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989). The level of intention has to be toward reflection rather than like reaction; the question goes to this level of thought and not to the particular act of the defendant in the crime as a whole.

Causation is not an element in the sentencing statute. Rather, the jury must find that the conduct of which the defendant was convicted under the law of the parties at the guilt/innocence stage of the trial was done deliberately and with the intent that death would result. In Harris's case the jury had to find that he deliberately bludgeoned Merka and reasonably expected that Merka would die. For instance, if the jury believed that Danny acted deliberately and with the intent that Merka die, the jury would still have to determine independently whether Harris acted deliberately and had intent. One defendant's deliberateness and intent will not be imputed to another defendant.

The death penalty is extreme. The law is structured only to execute those individuals who reasonably expected that their deliberate actions would cause death. If a person is a lookout for a robbery, and a victim is shot during the course of the robbery, the lookout will be sentenced to death only if he intended that his surveillance would result in the death of someone. If only the person who shot the victim had the intent that death would result, his intent cannot be transferred to the lookout. Because the jury found that Harris acted deliberately and with the intent that death result and that Harris would be dangerous in the future, they ordered him to die.

### (2) *Youth.*

Harris was seventeen when he murdered Tim Merka; he asserts that the jury could not give mitigating effect to his youth. The second special interrogatory provides the jury a vehicle by which to give youth its mitigating effect. *Graham*, 950 F.2d at 1031. If the jury had believed that his youth reduced his future dangerousness, they would have answered "no" to the second interrogatory. They did not.

Harris further argues that his youth is especially mitigating because he was "influenced by" his older brother, an older friend, and his girlfriend. If the jury did think Harris, collapsing under peer pressure, was only reacting to an irrepressible impulse with each swing at Merka's head, then they also could have found that he did not deliberately kill Merka. *See Bridge*, 963 F.2d at 770.

### (3) *Intoxication.*

Rencher testified that Harris had been drinking gin and smoking marijuana the night of the murder. The mitigating effect of his intoxication fits within the first interrogatory. *Bridge*, 963 F.2d at 768. The jury heard the evidence, considered its relation to deliberateness, and dismissed it.

### (4) *Good Character.*

Harris asserts that the jury could not give mitigating effect to his good character evidence. The only character evidence he offered was that, while he was in custody, he had a clean disciplinary record. Obedient, passive behavior while in custody goes directly to the issue of future dangerousness.

Harris's mother also testified. She said that her son never had been convicted of a felony, and she pleaded for her son's life. To the extent this could be considered evidence of Harris's character, rather than of a mother's love, it would fit within the scope of the second issue. Again, the jury heard the evidence, considered its relation to future dangerousness, and dismissed it.

The evidence offered and conjured presents no special moral dilemma for the jury. There is nothing in the debris of Harris's life that could be thought by a reasonable juror to exculpate him morally for murder.

The jury was able to use all of the evidence before it to discern some mitigation, but the mitigation had to come in the form of a refusal to find one of the two elements under Texas Law. Harris has proffered no evidence that would, to a reasonable juror, lessen his moral culpability.

Harris essentially argues that the long, twisted effort to narrow the application of the death penalty should be discarded. It may be that the quest for objectivity has forced humanity from the process, but humanity was so often perverted by prejudices like race-based stereotyping that it was constitutionally objectionable as being an exercise in will, not in reason.

### B. *Preclusive Effect of the Statute.*

Harris contends that the Texas statute violated his right to effective assistance of counsel because it prevented his attorneys from offering evidence of his intelligence, brain damage, mental disorders, and child abuse at the penalty stage of the trial. He says that, but for the statute, his attorneys would have investigated and presented this mitigating evidence during the penalty phase. They did investigate, but they chose not to present it. Deliberate non-presentation of mitigating evidence precludes the possibility of a claim on that evidence of what effect it might have had on the jury. *May v. Collins*, 904 F.2d 228, 232 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991).

### C. *Unascertainable Dispositive Terms.*

Harris claims that the words *deliberately*, *probability*, and *society* are so vague that they render the Texas capital sentencing statute unconstitutional.

The state of Texas allows for an organized, timely debate on the meaning of words. While Harris did file a pretrial motion to hold the sentencing statute unconstitutional, he did not submit a proposed definition to the court at the time of his sentencing nor did he object to the punishment charge on this basis. *See* Tex.Crim. Proc. Code Ann. arts. 36.14 and 36.15 (1981). Not only does this failure procedurally bar his claim now, it also implies

that he, like the jury, used his common knowledge to understand the meaning of the words *deliberate, probability,* and *society.*

Harris contends that the question in the first special issue, whether the defendant acted deliberately, is unconstitutional because the definition of *deliberately* is unascertainable. Judicial efficiency does not allow, nor does common sense require, the court to define each word of every instruction. Moreover, common knowledge makes it unnecessary. *Ellis v. Lynaugh*, 873 F.2d 830, 839 (5th Cir.), *cert. denied*, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 384 (1989). The Texas courts have "properly declined to assume a legislative function and define 'deliberate', and instead relied on the 'ordinary meaning' of the term as a juror individually knows it." *Lane v. State*, 743 S.W.2d 617, 628 (Tex.Crim.App. 1987). *Deliberate* is commonly understood to have a narrower meaning than *intentional. Id.* While *intentional* implies that the actor desired the consequence of his act, *deliberate* has the sense of an act produced by consideration, an evaluation rather than a reaction.

After defining *deliberate*, the next request would be for the court to define the terms used in the definition, an infinite process. Communication requires and the existence of a functioning society implies an adequate common ground of meaning in the symbols.

Although definitions are evolutionary and individual knowledge is imperfect, the collective sense of the jury is more than sufficient to understand and to apply the words of the court's charge. Special uses and exceptional terms may require explanation in jury instructions, but if the charge cannot be given in language accessible to normal people, the courts, legislature, lawyers, and politicians have failed. This case is not an instance of failure.

Harris has offered no evidence that at the time of the murder he did not act deliberately, by any definition. The record is replete with evidence that his acts were, indeed, deliberate. As Danny pinned Merka down, Harris smashed him in the head

with an automobile jack. When Merka asked them what they wanted, Harris responded with at least seven more blows to the head. No rational trier of fact could conclude that Harris did not deliberately bludgeon Tim Merka to death.

The jury was also capable of applying common sense to ascertain the meaning of *probability* and *society*. *See Jurek,* 428 U.S. at 272–76, 96 S.Ct. at 2956–58 (opinion of Stewart, Powell & Stevens, JJ.); *id.* at 279, 96 S.Ct. at 2959 (White & Rehnquist, JJ. & Burger, C.J., concurring); *Barnard v. Collins,* 958 F.2d 634, 641 (5th Cir.1992). Again, Harris did not offer an instruction defining *probability* or *society* at the close of evidence. Furthermore, he does not now offer evidence that the jury was confused about the meanings of either term. He only baldly asserts that the degree of probability is unclear and that there might be a difference between prison society and free society. *Probability,* by common understanding, means more than a 50% chance. The jury had to find beyond a reasonable doubt that it was more likely than not that Harris would be dangerous in the future. Tex.Code Crim.Proc.Ann. art. 37.071(c) (1981). *Society,* on its face, includes all of the subcommunities that make a larger community like Texas. The state of Texas has an interest in protecting the general population, inmates, and prison guards. The legislature did not find the need to distinguish between free and prison society.

### 6. *Voir Dire Claims.*

 Harris brings three claims related to the process of choosing the trial jury. All three claims fail.

### A. *Challenges for Cause.*

Harris argues that two of the state's challenges for cause, although they were made on a valid state-law basis, were actually used to circumvent constitutional standards that prevent juror exclusion based on a prospective juror's inability to apply the death penalty. If a prospective juror cannot apply the law in considering imposition of the death penalty, that juror can be removed for cause. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Prospective jurors Easley and Koy had expressed their opposition to the death penalty, but they had also expressed their ability to follow the law even if imposition of that penalty was the outcome. Harris claims that the prosecutor, failing to achieve removal for cause on their ability to apply the death penalty, asked them if they would be able to impose the minimum sentence allowed by the state (five years probation) in order to elicit a denial from them to have grounds to excuse for cause veniremen who were favorable to the defense.

The state has the right to question prospective jurors about their ability to apply the full range of punishments, including minimum punishments. *Nethery v. State,* 692 S.W.2d 686, 691 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Harris claims that the only time the prosecutor asked this question was in trying to dismiss Easley and Koy for cause. This is not true. At least one other time, the prosecutor asked the identical question of a prospective juror who expressed no reservations about applying the death penalty and who was accepted by both sides and served on the jury. *See* Voir Dire Transcript, Moreland (No. 28), at 21–22. Harris's claim is mere conjecture, and will fail.

### B. *Peremptory Challenges.*

The state excused three black veniremen by using peremptory challenges. In questioning one of these prospective jurors, Georgia Faye Harris, the prosecutor asked:

> The victim in this case is white, and the Defendant in this case, of course is black. And his name is Harris, the same as your name. Would you have a tendency to lean his way because he's black and his name is Harris?

Harris argues that this question, along with a document discovered in the prosecutor's files that delineates possible sympathy for the application of the death penalty by region, violated his constitutional rights because veniremen cannot be peremptorily

challenged on the basis of race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

For Harris to press this claim, he must have timely objected to the challenge of Georgia Harris.. Even though the state court heard the merits of this claim on the application for habeas corpus, this court may address this issue on procedural grounds. *Wilkerson v. Collins,* 950 F.2d 1054, 1063 (5th Cir.1992).

It is a long-standing principle that contemporaneous objections are necessary to prevent abuse of the judicial process. *See Cady v. Norton,* 31 Mass. (14 Pick.) 236, 237 (1832). Harris failed to make a contemporaneous objection. The contemporaneous objection rule applies to claims to a representative jury under the Constitution. *Wilkerson,* 950 F.2d at 1063; *Thomas v. Moore,* 866 F.2d 803, 804 (5th Cir.), *cert. denied,* 493 U.S. 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989). Harris argues, however, that because the Supreme Court recently extended this constitutional right to the jurors themselves, it is inappropriate to rely on defendant's counsel to object. While veniremen have constitutional rights, they almost always are protected by a litigant asserting those rights. *See Powers v. Ohio,* — U.S. —, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) and *Edmonson v. Leesville Concrete Co.,* — U.S. —, 111 S.Ct: 2077, 114 L.Ed.2d 660 (1991). With the standing of the litigant to represent the jurors comes the responsibility of making the contemporaneous objection.

Even accepting Harris's argument, the court extended the right to the jurors themselves only last year. Because this interpretation is a new rule of construction of constitutional law that did not exist at the time of Harris's trial or direct appeal, he cannot receive the benefit of that rule in this proceeding. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). This proposition validates reasonable, good-faith interpretations of existing law made by state courts, even if those determinations are contrary to later decisions. *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).

Even if Harris were able to overcome these procedural bars, his substantive claim fails. Harris must first establish a *prima facie* case of purposeful discrimination. Once that is accomplished, the burden shifts to the state to come forward with a neutral explanation for the challenges. That explanation need not rise to the level of justification for a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

Assuming, without deciding, that Harris has made the requisite showing for a *prima facie* case, the state has provided neutral explanations for the challenge, as found by the state judge:

> The prosecutor exercised a peremptory challenge on prospective juror Georgia Faye Harris because she laughed at inappropriate times during voir dire, and her demeanor on the stand concerned the prosecutor. Ms. Harris was also weak on the death penalty. The prosecutor felt that Ms. Harris may feel some sort of kinship to Applicant because their name was the same, and that they were of the same race. During the voir dire, as well as after it, the prosecutor felt as if he had alienated Ms. Harris by his detailed, complex questioning, and felt that Ms. Harris may hold it against him during trial.

*Ex Parte* Harris, Application No. 17,919–01, at 822–23 (Finding of Fact No. 20).

Harris's contention that this finding cannot be a neutral explanation because it contains the race-related reason is disingenuous. Just because the neutral explanations offered were grouped with the race-related statement in the state court's finding does not taint the neutral reasons, nor does the memorandum found in the prosecutor's files supply the inference that the neutral explanations are not genuine. The views expressed in that memorandum were not those of the prosecutor, nor did he request the information in the memorandum. Whatever inferences of racial motivation that the memorandum suggests cannot be imputed to the prosecutor or his decision-making process during this voir dire without evidence.

C. *Racial Motivation of the Prosecutor.*

Harris argues that the questioning of prospective juror Georgia Harris and the memorandum combine to demonstrate the prosecutor's racial bias, which affected his prosecution and decision to seek the death penalty, thus violating Harris's equal protection rights. Invidious motives by a prosecutor may violate the Constitution. *See McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985); *Thompson v. Lynaugh,* 821 F.2d 1054, 1064–65 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987). The propriety of the voir dire by of the prosecutor has already been established. Furthermore, the only evidence in the record about the prosecutor's relationship to the memorandum exonerates him of any invidious motivation:

I received the memo. I read the memo. But these are the views of James H. Keeshan. They are not my views. If any racial prejudice can be noted in this memo ... I did not rely on that in any way in picking these jurors.

*Ex Parte* Harris, Habeas Corpus Post–Conviction Hearing, No. 18,007–85, at 39–40.

7. *Grand Jury Claim.*

Harris contends that the state systematically excluded two distinct groups, blacks and people between the ages of eighteen and thirty-five, from the grand jury that indicted him, thus denying him an indictment by a fair cross section of the community. As evidence for this proposition, Harris relies on a statistical study that purports to show a significant disparity between the percentages of these groups in the population aid of those who served on Brazos County grand juries between 1974 and 1979.

To demonstrate an equal protection violation, Harris must make a *prima facie* case that the procedure employed in picking the grand jury resulted in a substantial under-representation of the identifiable group. *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). The identifiable group must be one that is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Id.*

Harris's claim for the youth group fails because young people are not a cognizable group that is subject to systematic repression. *See generally Sands v. Cunningham,* 617 F.Supp. 1551 (D.N.H.1985); *cf. Graham v. Lynaugh,* 854 F.2d 715, 723 (5th Cir.1988), *vacated on other grounds,* 492 U.S. 915, 109 S.Ct. 3237, 106 L.Ed.2d 585 (1989). Harris does not even assert a plausible basis for youth being a cognizable group.

Blacks are a cognizable group. *Vasquez v. Hillery,* 474 U.S. 254, 260–62, 106 S.Ct. 617, 621–23, 88 L.Ed.2d 598 (1986); *Neal v. Delaware,* 103 U.S. 370, 385–92, 26 L.Ed. 567 (1880). Harris has proved the degree of under-representation through statistics, and the Texas "key man" system can be susceptible to abuse as applied. *See Castaneda* 430 U.S. at 494, 497, 97 S.Ct. at 1280, 1281. Because Harris has established a *prima facie* case of an equal protection violation, the burden shifts to the state to rebut that case.

The state habeas court found that of the twenty names picked by the five grand jury commissioners, five were black, 25%. That court also noted that the most recent census figures showed that 16.1% of Brazos County was black. In addition, the court found that the names of the twelve grand jury members were blindly drawn from a cigar box, resulting in one of the black veniremen being placed on the grand jury. Harris does not dispute these findings. The state has clearly rebutted the *prima facie* case.

8. *Instruction on Lesser Included Offenses.*

The trial court instructed the jury only on capital murder and murder; it denied Harris's request to instruct on robbery and aggravated assault. Harris argues that, because the jury could have concluded he was guilty of robbery or aggravated as-

sault, but not capital murder, the court should have instructed the jury on the lesser offenses. *See Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

■ In a capital case, due process does not require that the court instruct the jury on every lesser included non-capital offense supported by the record. *Schad v. Arizona,* — U.S. ——, ——, 111 S.Ct. 2491, 2504, 115 L.Ed.2d 555 (1991). The court must, however, provide the jury an option, other than acquittal or conviction of capital murder. *See Beck,* 447 U.S. 625, 100 S.Ct. 2382. If a jury believes a defendant to be guilty only of a non-capital offense, but the choices are either to convict him of capital murder or set him free, the jury might be tempted to convict just to keep him off the streets. In providing the jury a third option to convict under a lesser included offense, the court eliminates the all-or-nothing choice between a capital conviction and no punishment at all. *Spaziano v. Florida,* 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984).

■ The Harris jury had three options: capital murder, murder, and acquittal. The jury was instructed to convict of capital murder if it found beyond a reasonable doubt that Harris robbed and intentionally killed Merka. If the jury found either that Harris did not intentionally kill Merka or that he did not rob Merka, then the jury was instructed to convict Harris of murder only. If the jury had reasonable doubt that Harris was guilty of capital murder or murder, then they were instructed to acquit Harris.

The record is replete with evidence that Harris intentionally killed Merka by crushing his skull with an automobile jack, supporting the jury's conviction of capital murder. Assuming, however, that Harris did not intend to kill Merka, the jury would have convicted him of murder only. Assuming even further that Harris only robbed and assaulted Merka, the court instructed the jury to acquit him. There is no basis to assume that the jury, if it believed Harris only robbed and assaulted Merka, would have convicted him of capital

murder rather than convict him of murder as an alternative to acquitting him. *See Schad,* 111 S.Ct. at 2505. If a jury finds that a defendant is a dangerous armed robber, but not a capital murderer, they are not likely to violate their instructions doubly by convicting the defendant of the most serious offense.

9. *Intentional Suppression of Material Evidence.*

■ Harris claims to have uncovered material evidence going to the credibility of one of the state's witnesses that was intentionally suppressed by the prosecutor. In the prosecutor's files was a set of handwritten notes that referred to Valarie Rencher's role in the events on the night of the murder. The notation on the robbery of the U–Totem store had the words "they told her to look out" in the body of the notes, and the words "leave out?" in the margin. Harris contends that this notation is evidence that Rencher was a lookout during the robbery and would have lessened her credibility in the eyes of the jury during her testimony implicating Harris in the murder.

Assuming, without deciding, that Harris's interpretation on the notations is a valid inference, Harris must demonstrate that the evidence suppressed is material to guilt. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). This rule applies to impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). If the evidence is not likely to change the verdict, a new trial is not necessary. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

■ Harris has failed to show either that the evidence was material or that it would have been likely to change the verdict. Because Rencher was a critical witness for the state, evidence going to her credibility had to be turned over to the defense. *Giglio,* 405 U.S. at 153–54, 92 S.Ct. at 765–66. This evidence, however, was not material to her credibility as a witness. The jury knew that Rencher was

charged with criminal activity and was offered a plea bargain in exchange for her testimony. The jury also knew that Rencher was present during the U–Totem robbery. The suppressed evidence, at worst, merely made a stronger case against Rencher for participation in that robbery. For Harris to suggest that this additional fact might have started a chain reaction in the jurors' minds, affecting their ultimate conclusion, is to stretch the concept of materiality beyond its breaking point. Indeed, the evidence that Rencher was part of the robbery gang might have made her knowledge of the murder more credible to the jury, since she would have been an active participant rather than a mere by-standing accomplice.

### 10. *The Plea Agreement with Rencher.*

 Valarie Rencher, Harris's girl-friend, was the state's chief witness. She was fifteen at the time of the murder, and she told the jury in detail what events led to and followed Merka's death. Because her bias is evidence favorable to Harris, the state must reveal the plea agreement they made with Valarie in exchange for her testimony. *See Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381; *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196.

 The state did disclose the agreement. As Rencher testified before the jury, the agreement with the government was that she would get no more that ten years in prison. She agreed to a maximum, not a minimum. Zero years is fewer than ten years, so it is within the terms of the agreement. Furthermore, there is no evidence whatsoever to support the allegation that the state misled the jury to believe that Rencher would receive ten years for her participation in the crime or that she would be tried as an adult. The juvenile prosecutor testified at Harris's trial that the juvenile court denied her motion to waive Rencher's juvenile status. Because the juvenile court did not transfer Rencher to adult court, the state could not try her and execute the plea agreement. The same day the jury heard Rencher tell of her potential plea agreement, the juvenile pros-ecutor told them that Rencher had actually received only probation for truancy. On cross examination, Harris's own attorney asked the juvenile prosecutor, "The most severe punishment that Valarie Rencher got out of her involvement ... was she was placed on a year's probation with a relative, is that your testimony?" The allegation that the state somehow misled the jury is based on an assertion of events opposite to what the record reveals.

### 11. *Assistance of Counsel.*

 Harris asserts that his attorneys failed to provide him effective assistance at the investigative, pre-trial, trial, post-trial, and direct appeal proceedings. To prove ineffective assistance of counsel, Harris must show that his counsel made errors so serious that he was deprived a fair trial and that, but for counsel's error, the result of the trial would have been different. U.S. Const., amend. VI; *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States v. Blankenship,* 923 F.2d 1110, 1117 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2262, 114 L.Ed.2d 714 (1991). The two prongs of the test are cause and prejudice. If the court decides either that counsel performed reasonably or that the defendant suffered no prejudice, the claim fails, and the court need not address the remaining prong. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

 This court's scrutiny of counsel's performance is highly deferential. A strong presumption exists that counsel's performance was adequate and that decisions made by counsel at trial were strategic. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Green,* 882 F.2d 999, 1003 (5th Cir.1989). In challenging his death sentence, Harris must show that there is a reasonable probability that, absent the errors, the jury or the appeals court would not have sentenced him to die. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068.

 The writ of habeas corpus is not a means to review judgments for ordinary mistakes in the processes of trial and ap-

peal. Courts concede that errors occur and that they may not be corrected in the direct appeals. In the special instance of federal review of state criminal judgments, this court is limited to determining whether the conviction was obtained in violation of the national standards for the administration of justice that are in the Constitution. The right to counsel is constitutional, but it is the right to reasonable help from a trained person, neither the best possible nor the worst plausible.

A chosen course of action is not misguided simply because hindsight later reveals that another course of action might have achieved a different result. To bring his ineffective assistance claim, Harris must do more than nit-pick. He must show that, but for his counsel's errors, he would not have been sentenced to death.

Harris asserts that his attorney made thirteen errors ranging from failing to investigate Harris's mental condition to failing properly to question prospective jurors on voir dire. That another attorney may have chosen different trial tactics does not mean that Harris's attorney was inadequate. Most of Harris's assertions of error are speculative, and none of them, even if true, was prejudicial. Cumulatively, if true, the claimed errors still could not have skewed the course of evidence and proceedings to Harris's detriment. As the Constitution requires, Harris received effective assistance of counsel. An unsuccessful defense is not necessarily an unconstitutional defense.

12. *Separation of Jurors.*

■■■■ Harris brings two claims arising out of the separation of jurors in alleged violation of state procedural rules. Both claims will be denied.

A. *Due Process Violation.*

After the judge instructed the jury, he permitted them as a group to move their cars and accompanied them to supervise their conduct. Harris objected to this separation of jurors, without his consent, as a violation of Texas law. Tex.Crim.Proc. Code Ann. art. 35.23 (1966). The judge

denied his motions for a mistrial and a new trial. A panel of the court of criminal appeals originally reversed his conviction on this point, but on rehearing *en banc*, it reversed itself, finding that the record adequately demonstrated no outside contact with the jurors. *Harris v. State*, 738 S.W.2d 207, 222 (Tex.Crim.App.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). Harris now argues that this decision was so arbitrary and fundamentally unfair that it violated his constitutional right to due process.

Harris does not argue, nor can he, that the separation of the jurors itself violated some constitutional right. The requirement is a creature of state procedural law, not something emanating from federal constitutional principles, and its violation, if there was one, is not reviewable by this court. *See Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982); *Evans v. McCotter*, 790 F.2d 1232, 1238 n. 6 (5th Cir.), *cert. denied*, 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986).

Harris's claim can be only that the state appellate court's reversal of itself is such a fundamentally flawed procedure that his due process rights were violated. This cannot be. On motions for rehearing, courts often take a second look at a motion and issue a new opinion having the opposite effect of the first, even based on substantially the same evidence. This is especially true where a panel of the court is reversed by the court sitting *en banc*. Whether the second opinion is correct is not for this court to decide; the route traveled in reaching it was certainly not arbitrary or fundamentally unfair, as evinced by the reasoned opinions of the appellate judges. *See Harris*, 738 S.W.2d 207. Harris's only argument is that the second, unfavorable decision, disagreed with the first, favorable decision, based on substantially the same evidence. This is not fundamentally unfair.

B. *The Judge's Testimony.*

Harris next claims that the trial judge's testimony about the separation of the jurors while issuing a ruling on Harris's mo-

**644**

tion for a new trial violated his constitutional due process rights. Both during trial (outside the presence of the jurors) and again during a hearing considering Harris's motion for a new trial, Judge Martin testified about his actions during the jury separation and his belief that the jury was not corrupted by outside contact. Harris characterizes this testimony as putting the judge in the position of advocate for the state, since the judge offered factual information from his own recollection, and then based his ruling on that information. Harris relies on primarily two cases for the proposition that a judge is not a competent witness in a trial over which he presides. *See Brown v. Lynaugh,* 843 F.2d 849 (5th Cir.1988); *Tyler v. Swenson,* 427 F.2d 412 (8th Cir.1970).

Harris's reliance is misplaced. While the principle enunciated in these cases is indisputable, its application to these events is inappropriate. If the judge is a material witness to the only question before him, he cannot hear the case. When the issue on the merits is whether the judge had threatened the defendant into a guilty plea from which the defendant was trying to obtain post-conviction relief the judge cannot be a material witness and hear the case. *Brown,* 843 F.2d at 851. When the presiding judge testified about the actions of the defendant during an escape from that judge's courtroom at the trial of the defendant on the escape itself, he erred. *Tyler,* 427 F.2d at 413. Here, the judge was merely providing facts about the jury separation in support of his ruling about a collateral matter, during a capital murder trial, outside the presence of the jury. The jury was not tainted. Everything in the record shows that the judge was impartial.

13. *Conclusion.*

All of Harris's claims fail on the merits. Because he received all the procedural protection the Constitution requires, his petition will be denied.